# EXHIBIT 5

LAW OFFICES
## KRAMON & GRAHAM, P.A.
ONE SOUTH STREET
SUITE 2600
BALTIMORE, MARYLAND 21202-3201
TELEPHONE: (410) 752-6030
FACSIMILE: (410) 539-1269
www.kramonandgraham.com

EZRA S. GOLLOGLY
—
ADMITTED IN MD

E-MAIL
egollogly@kg-law.com
DIRECT FACSIMILE
(410) 361-8233

January 7, 2022

**BY ELECTRONIC MAIL AND CERTIFIED U.S. MAIL-RRR**

Martee Stokes
AXIS
10000 Avalon Boulevard
Suite 200
Alpharetta, GA 30009
martee.stokes@axiscapital.com

Karen A. Tribik
Karen.A.Tribik@marsh.com
Marsh Advisory, Claims Solutions
445 South Street, Suite 210, Morristown, NJ
07962

Atlas West End Silver Hill LLC
Attn: Jeff S. Wainwright
2200 Pennsylvania Ave., NW, Fl. 4
Washington, DC 20037

Re:  *Wayne Padmore, et al. v. Atlas West End Silver Hill, LLC, et al.*,
Circuit Court for Prince George's County Case No. CAL20-14812
(AXIS File No. C-019-000012089)

All:

I write to let you know that Twin City Fire Insurance Company and Hartford Casualty Insurance Company (collectively, "Hartford") have retained our firm as coverage counsel for this matter, which is scheduled for mediation on January 13, 2022.

At the mediation, Hartford will be looking to AXIS, Atlas' umbrella/excess carrier, and Atlas to assume primary responsibility for Hartford's insured, Gates Hudson & Associates Inc., in connection with any settlement offer.

The Property Management Agreement between Atlas and Gates Hudson provides, at ¶ 8(c):

> Manager's [Gates Hudson's] liability policies required hereunder shall list Owner [Atlas] as an additional insured. All of Owner's [Atlas'] insurance policies required hereunder shall name Manager [Gates Hudson] as an

22103/0/03868671.DOCXv1

AXIS000246

additional insured and provide for forty five (45) days' prior written notice to Manager of cancellation or non-renewal. *Owner's [Atlas'] property and liability policies are primary and non-contributory.*

(Emphasis added.) The Owner's required insurance policies, under ¶ 8(a), include general liability insurance with minimum limits of $1,000,000 per occurrence, and $2,000,000 aggregate; and umbrella liability insurance with minimum limits of $10,000,000 per occurrence and in the aggregate. Paragraph 8's insurance requirements are in addition to the indemnification provisions in ¶ 7.

Consistent with ¶ 8(c), Hartford's Real Estate Property Managed endorsement provides: "With respect to your liability arising out of your management of property for which you are acting as real estate manager, this insurance is excess over any other valid and collectible insurance available to you, whether such insurance is primary or excess."

AXIS recognized its obligations, as reflected in the attached email exchange from September 2020, but it has not taken any steps to defend Gates Hudson and its employees. We expect AXIS to assume the primary indemnity obligation for Atlas at the January 13 mediation, to assume the defense of Gates Hudson and its employees, and to reimburse Hartford for all fees and costs it has incurred to defend Gates Hudson and its employees.

Finally, Hartford requests that AXIS, Marsh, and/or Atlas **immediately** forward all of Atlas' primary, umbrella, and/or excess liability policies available for this loss.

This letter is without prejudice to Hartford's rights, including but not limited to its reservation of the right to deny coverage for the lawsuit.

Please contact me if you have any questions.

Sincerely,

*/s/ Ezra S. Gollogly*

Ezra S. Gollogly

Enclosure

cc:   Steven M. Klepper

AXIS000247

**From:** Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Sent:** Thursday, September 10, 2020 8:58 AM
**To:** Stokes, Martee (Contractor) <martee.stokes@axiscapital.com>; Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Cc:** Dan O'Leary <dan@preferins.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

Martee,

I'm the claims advocate at Marsh working on the Atlas account.

I've read the property management agreement, and as Paul mentions Atlas is to indemnify Gates Hudson the property manager.  If you would provide defense counsel's contact information.  Also, please confirm that the suit has been answered on behalf of Atlas/Gates or an extension has been requested.

Thanks,
Karen

Karen Tribik I Claims Advocacy Professional
Marsh Advisory, Claims Solutions
445 South Street, Suite 210, Morristown, NJ  07962
Direct: 862-812-9584 I Fax:  973.401.5165
Email:  Karen.a.Tribik@marsh.com

**From:** Stokes, Martee (Contractor) <martee.stokes@axiscapital.com>
**Sent:** Wednesday, September 9, 2020 5:06 PM
**To:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Cc:** Tribik, Karen A <Karen.A.Tribik@marsh.com>; Dan O'Leary <dan@preferins.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

Hi Paul – thanks for your reply. I believe that there is a provision in the Agreement requiring the Manager to indemnity and afford additional insurance status to the Owner. However, in view of your reply,  I will take a second look.  Thanks for forwarding this on to Dan O'Leary as we do need to have Gates Hudson & Associates' carrier involved in review of the complaint.

Dan – please give me a call at your earliest.

Best Regards,

1

AXIS000248

Martee

**Martee Stokes, CPCU CCLA**
Contractor

martee.stokes@axiscapital.com
**T: 678-746-9000**
**D: 678-746-9422**
**F:  678-746-9315**



10000 Avalon Boulevard
Suite 200
Alpharetta, GA 30009
axiscapital.com

*Rated "A" by Standard & Poor's and*
*"A+" by A.M. Best for Financial Strength*



**At AXIS, we routinely collect and use personal information about individuals, including insured persons, claimants or business partners. We take our responsibilities to handle your personal data with care very seriously and protecting the privacy of your personal data is of great importance to us. In this Privacy Notice, we want you to understand when, why and how we collect and use personal information about you, your rights regarding this information, the conditions under which we may disclose it to others and how we keep it secure.**

**From:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Sent:** Wednesday, September 9, 2020 4:58 PM
**To:** Stokes, Martee (Contractor) <martee.stokes@axiscapital.com>
**Cc:** Tribik, Karen A <Karen.A.Tribik@marsh.com>; Dan O'Leary <dan@preferins.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

> **WARNING:** Email originated from outside the AXIS organization.

Martee,

Thanks for the response and timeline of events below. Just to clarify, Marsh is the broker for Atlas Real Estate Partners, LLC. The name Atlas West End Silver Hill LLC is a named insured under Atlas Real Estate Partners, LLC, not under Gates Hudson & Associates policy. It is the opposite of what you are saying. Per the property management agreement, Atlas West End Silver Hill LLC should be providing defense costs and indemnity for Gates Hudson & Associates. Please also see responses below in red.

Regards,

AXIS000249

Paul Margiotta, Vice President
Account Executive
1166 Avenue of the Americas, New York, NY 10036
Office +1 212 345 8043 | Mobile + 1 917 854 9607 | Fax +1 212 948 0668
Paul.N.Margiotta@marsh.com
www.marsh.com | Marsh USA



---

**From:** Stokes, Martee (Contractor) <martee.stokes@axiscapital.com>
**Sent:** Wednesday, September 09, 2020 4:43 PM
**To:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Cc:** Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

Hello Paul,

By way of status,  I left another  voicemail for Danielle Serrano this afternoon.

I have  referred the summons and complaint  to Defense Counsel for conflict check while AXIS continues its review of coverage.

AXIS is diligently reviewing this matter, however we respectfully bring to your attention that this  lawsuit was served on August 13.  AXIS did not receive the suit for review of coverage until September 1.   We note that Atlas Silver Hill LLC is an additional insured under the Gates Hudson & Associates policy, according to the Property Management Agreement.   Please tender the Complaint to Gates Hudson & Associates carrier for review of coverage.

Meanwhile, kindly respond as to whether you are able to clarify

(1) whether Marsh is the broker for both Atlas Real Estate and Gates Hudson & Associates; <span style="color:red">Only Atlas Real Estate – here is the contact information for the Gates Hudson broker if needed (also copied).
Dan O'Leary
Partner
Preferred Insurance Services Inc
1602 Village Market Boulevard SE, Suite 210
 Leesburg VA 20175
Direct (703) 667-5953
Cell (703) 309-9938
Fax 703-359-5915
dan@preferins.com</span>

(2) has Gates Hudson & Associates reported this claim to its own professional liability, GL and Umbrella/Excess; if so, please provide carrier claim numbers and contact information; <span style="color:red">unsure, copying Dan O'Leary for response</span>
(3) provide a name and email/telephone contact for Atlas Real Estate.
<span style="color:red">Joe Stampone
646-863-0912
jstampone@atlasrep.com</span>

Thank you,

AXIS000250

Martee

**Martee Stokes, CPCU CCLA**
Contractor

martee.stokes@axiscapital.com
**T: 678-746-9000**
**D: 678-746-9422**
**F: 678-746-9315**



10000 Avalon Boulevard
Suite 200
Alpharetta, GA 30009
axiscapital.com

*Rated "A" by Standard & Poor's and*
*"A+" by A.M. Best for Financial Strength*



**At AXIS, we routinely collect and use personal information about individuals, including insured persons, claimants or business partners. We take our responsibilities to handle your personal data with care very seriously and protecting the privacy of your personal data is of great importance to us. In this Privacy Notice, we want you to understand when, why and how we collect and use personal information about you, your rights regarding this information, the conditions under which we may disclose it to others and how we keep it secure.**

**From:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Sent:** Wednesday, September 9, 2020 4:19 PM
**To:** Stokes, Martee (Contractor) <martee.stokes@axiscapital.com>
**Cc:** Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

> **WARNING:** Email originated from outside the AXIS organization.

Hi Martee,

What is the latest with this claim? Is Axis providing defense cost and indemnity for the property manager (Gates Hudson)? Can you please call Karen Tribik cc'd on this email to discuss?

Regards,

Paul Margiotta, Vice President

AXIS000251

Account Executive
1166 Avenue of the Americas, New York, NY 10036
Office +1 212 345 8043 | Mobile + 1 917 854 9607 | Fax +1 212 948 0668
Paul.N.Margiotta@marsh.com
www.marsh.com | Marsh USA



---

**From:** Danielle Serrano <dserrano@gateshudson.com>
**Sent:** Friday, September 04, 2020 3:21 PM
**To:** Matyola, Mark <Mark.Matyola@marsh.com>; martee.stokes@axiscapital.com
**Cc:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>; Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Subject:** RE: Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

Martee,

I received your voicemail, but was not able to hear your cell number.  I left a voicemail on your office phone.  I am happy to call me if you can please provide your cell number.

Thank you,

**Danielle Serrano**
Asset Management Coordinator  **| Gates Hudson**
3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031
(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com
Please consider the environment before printing this email.

---

**From:** Matyola, Mark <Mark.Matyola@marsh.com>
**Sent:** Thursday, September 03, 2020 2:57 PM
**To:** martee.stokes@axiscapital.com
**Cc:** Danielle Serrano <dserrano@gateshudson.com>; Margiotta, Paul N <Paul.N.Margiotta@marsh.com>; Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Subject:** Marsh Client: Atlas Real Estate Partners, LLC / AXIS FILE NUMBER: C-019-000012089 / Claimant : Elizabeth Jarrell & Wayne Padmore - Residences at Silver Hill Lawsuit

Hi Martee, Thank you so much for taking my call on this matter.

As I mentioned, there is a bit of a short burn on this as the suit was served on 8-13-2020, with a 30 day response date. Also, the managing agent, Gates Hudson, is seeking defense and indemnification pursuant to the attached Property Management Agreement. Please review as needed. I've cc'd Danielle Serrano at Gates Hudson to keep her in the loop.

My colleague, Karen Tribik, is the primary Casualty Claims consultant on Atlas Real Partners but she is out on PTO this week. She will be back Tuesday after Labor Day.

Really appreciate your assistance,
Best Regards,

5

Mark Matyola
Senior Vice President
Global Claim Practice
445 South Street, Suite 210, Morristown, NJ 07962
+  973 401 5009 | Fax +973 401 5165 |Cell 973 452 5681
Mark.Matyola@Marsh.com
www.marsh.com |

---

**From:** Danielle Serrano <dserrano@gateshudson.com>
**Sent:** Thursday, September 3, 2020 12:37 PM
**To:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>; Joe Stampone <jstampone@atlasrep.com>; Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>; Matyola, Mark <Mark.Matyola@marsh.com>
**Subject:** RE: Residences at Silver Hill Lawsuit

We are the managing agent.  Attached is the Property Management Agreement, which states that we are indemnified.

**Danielle Serrano**
Asset Management Coordinator  | **Gates Hudson**
3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031
(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com
Please consider the environment before printing this email.

---

**From:** Margiotta, Paul N <Paul.N.Margiotta@marsh.com>
**Sent:** Thursday, September 03, 2020 12:33 PM
**To:** Danielle Serrano <dserrano@gateshudson.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>; Joe Stampone <jstampone@atlasrep.com>; Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>; Matyola, Mark <Mark.Matyola@marsh.com>
**Subject:** RE: Residences at Silver Hill Lawsuit

Hi Danielle,

I do not see Gates Hudson listed as a named insured on the policy.  We do have the broad named insured endorsement on the policy that extends coverage to partnerships, JVs, etc. Please see below.

Can you please explain the relationship between Gates Hudson and Atlas Real Estate Partners, LLC?

AXIS000253

| Named Insured ||||
| ATLAS REAL ESTATE PARTNERS, LLC ||||
| **Policy Number** | **Policy Period** || **Effective Date** |
| P-001-000012089-02 | 07/10/2018  to  07/10/2019 || 07/10/2018 |
| Issued by |||
| AXIS Insurance Company ||||
| |||

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BROAD NAMED INSURED

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM**

As used in this policy, the term "Named Insured" shall refer to the Named Insured in the Declarations and any owned or controlled company, and all corporations (including subsidiaries of them), partnerships, joint ventures, limited liability companies or other organizations or other organizations or entities as now formed or constituted, which the Named Insured in the Declarations has:

- A fifty percent (50%) or more ownership interest; or
- Active managerial or financial control as evidenced in a written contract or agreement; or
- For which it is required or has agreed, pursuant to a written contract or agreement, prior to a loss to maintain insurance.

Regards,

Paul Margiotta, Vice President
Account Executive
1166 Avenue of the Americas, New York, NY 10036
Office +1 212 345 8043 | Mobile + 1 917 854 9607 | Fax +1 212 948 0668
Paul.N.Margiotta@marsh.com
www.marsh.com | Marsh USA



**From:** Danielle Serrano <dserrano@gateshudson.com>
**Sent:** Thursday, September 03, 2020 12:12 PM

AXIS000254

**To:** Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>; Margiotta, Paul N <Paul.N.Margiotta@marsh.com>; Tribik, Karen A <Karen.A.Tribik@marsh.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>
**Subject:** RE: Residences at Silver Hill Lawsuit

Thanks Lloyd.

Karen and Paul:  As an answer is due soon, can someone please confirm that the insurer will be defending the Gates Hudson entities and associates and filing a timely answer?

Thank you,

**Danielle Serrano**
Asset Management Coordinator  | **Gates Hudson**
3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031
(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com
Please consider the environment before printing this email.

---

**From:** Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>
**Sent:** Thursday, September 03, 2020 12:07 PM
**To:** Danielle Serrano <dserrano@gateshudson.com>; Margiotta, Paul N <paul.n.margiotta@marsh.com>; Tribik, Karen A <karen.a.tribik@marsh.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>
**Subject:** RE: Residences at Silver Hill Lawsuit

Hey Danielle,

I cannot confirm that the carrier is indemnifying and defending Gates Hudson, but I have added Karen Tribik and Paul Margiotta from Marsh who may be able to help clarify how this claim/defense will proceed.

Thank you!

Lloyd Grosklags
VP Asset Management
West End Capital Group

2200 Pennsylvania Ave NW | 4th Floor East | Washington, DC 20037
M: 262.707.9627
lgrosklags@westendcapitalgroup.com
On Sep 3, 2020, 11:58 AM -0400, Danielle Serrano <dserrano@gateshudson.com>, wrote:

Lloyd – can you please confirm that the carrier is indemnifying and defending Gates Hudson and will file a timely answer?  With the response deadline coming up, we don't want to be scrambling at the last minute.

Thanks!

AXIS000255

**Danielle Serrano**

Asset Management Coordinator  | **Gates Hudson**

3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031

(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com

Please consider the environment before printing this email.

---

**From:** Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>
**Sent:** Tuesday, September 01, 2020 2:28 PM
**To:** Danielle Serrano <dserrano@gateshudson.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>
**Subject:** RE: Residences at Silver Hill Lawsuit

Hey Danielle,

Marsh has provided the following this afternoon:

CLAIMANT: Padmore, Wayne & Jarrell, Elizabeth
MARSH FILE NUMBER: 20NYC_356498

I'll let you know any additional information I receive.

Lloyd

Lloyd Grosklags
VP Asset Management
West End Capital Group

2200 Pennsylvania Ave NW | 4th Floor East | Washington, DC 20037
M: 262.707.9627
lgrosklags@westendcapitalgroup.com

On Aug 31, 2020, 9:54 AM -0400, Danielle Serrano <dserrano@gateshudson.com>, wrote:

Good morning Lloyd,

9

It is my understanding that the property indemnifies Gates Hudson, so the carrier should represent both the property and Gates Hudson.  The insurance carrier will request a copy of our management agreement to confirm, which I have attached.

Can you please confirm with me once you hear back from the carrier?  We have to respond by 9/12/20.

Thank you,

**Danielle Serrano**

Asset Management Coordinator  |  **Gates Hudson**

3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031

(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com

Please consider the environment before printing this email.

---

**From:** Lloyd Grosklags <lgrosklags@westendcapitalgroup.com>
**Sent:** Sunday, August 30, 2020 3:03 PM
**To:** Danielle Serrano <dserrano@gateshudson.com>
**Cc:** Sheila Jones <sjones@gateshudson.com>; Jonathan Shymoniak <jshymoniak@gateshudson.com>
**Subject:** Re: Residences at Silver Hill Lawsuit

Hi Danielle,

I can indeed forward this along to our insurance carrier - however, I don't believe they will be representing Gates Hudson or the two site employees but rather will be representing Atlas West End Silver Hill LLC. Does this coincide with what you would expect in this scenario?

Thank you!

AXIS000257

Lloyd Grosklags
VP Asset Management
West End Capital Group

2200 Pennsylvania Ave NW | 4th Floor East | Washington, DC 20037
M: 262.707.9627
lgrosklags@westendcapitalgroup.com

On Aug 14, 2020, 11:29 AM -0400, Danielle Serrano <dserrano@gateshudson.com>, wrote:

Good morning Lloyd,

Please see attached a Complaint and Discovery for Silver Hill that was served on 8/13/20.  This stems from a carbon monoxide leak that occurred in January 2019.  Can you please forward to the carrier, as a response is required within 30 days of the date we were served.  It's likely there is already a claim established for this incident, as we did receive an attorney letter in February 2019.  Gates Hudson and two of our employees are listed as defendants, so I would like to have confirmation that the attorney assigned to this claim will also be representing all parties listed as defendants.

Please let me know if you have any questions.

Thank you,

**Danielle Serrano**

Asset Management Coordinator  | **Gates Hudson**

3020 Hamaker Court | Suite 301 | Fairfax | Virginia | 22031

(o) 703-876-9590 ext. 272 | (f) 703-876-0548



REAL PARTNERS IN REAL ESTATE | GatesHudson.com

Please consider the environment before printing this email.

AXIS000258

***********************************************************************
This e-mail, including any attachments that accompany it, may contain
information that is confidential or privileged. This e-mail is
intended solely for the use of the individual(s) to whom it was intended to be
addressed. If you have received this e-mail and are not an intended recipient,
any disclosure, distribution, copying or other use or
retention of this email or information contained within it are prohibited.
If you have received this email in error, please immediately
reply to the sender via e-mail and also permanently
delete all copies of the original message together with any of its attachments
from your computer or device.
***********************************************************************

***********************************************************************
This e-mail, including any attachments that accompany it, may contain
information that is confidential or privileged. This e-mail is
intended solely for the use of the individual(s) to whom it was intended to be
addressed. If you have received this e-mail and are not an intended recipient,
any disclosure, distribution, copying or other use or
retention of this email or information contained within it are prohibited.
If you have received this email in error, please immediately
reply to the sender via e-mail and also permanently
delete all copies of the original message together with any of its attachments
from your computer or device.
***********************************************************************

***********************************************************************
This e-mail, including any attachments that accompany it, may contain
information that is confidential or privileged. This e-mail is
intended solely for the use of the individual(s) to whom it was intended to be
addressed. If you have received this e-mail and are not an intended recipient,
any disclosure, distribution, copying or other use or
retention of this email or information contained within it are prohibited.
If you have received this email in error, please immediately
reply to the sender via e-mail and also permanently
delete all copies of the original message together with any of its attachments
from your computer or device.
***********************************************************************

***********************************************************************
This e-mail, including any attachments that accompany it, may contain
information that is confidential or privileged. This e-mail is
intended solely for the use of the individual(s) to whom it was intended to be
addressed. If you have received this e-mail and are not an intended recipient,
any disclosure, distribution, copying or other use or
retention of this email or information contained within it are prohibited.
If you have received this email in error, please immediately
reply to the sender via e-mail and also permanently
delete all copies of the original message together with any of its attachments

AXIS000259

from your computer or device.
*******************************************************************

****************************************************************************************************
****

This communication, including attachments, is for the exclusive use of addressee and may contain proprietary,
confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure,
dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender
immediately by return e-mail, delete this communication and destroy all copies.


****************************************************************************************************
****

This communication is from a law firm and may contain confidential or privileged information. Unauthorized retention,
disclosure, or use of this information is prohibited and may be unlawful under 18 U.S.C. §§ 2510-2521. Accordingly, if
this email has been sent to you in error, please contact the sender by reply email or by phone at 410-752-6030.

AXIS000260

## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

WAYNE PADMORE, *et al.*                             *

    **Plaintiffs,**                             *

vs.                                             *

                                      CASE NO.  CAL20-14812

ATLAS WEST END SILVER HILL, LLC, et al.     *

and                                             *

ATLAS WEST END SILVER HILL, LLC             *

and                                             *

ATLAS WEST END SILVER HILL                  *
MANAGER, LLC
                                                *
and                                             *

GATES, HUDSON & ASSOCIATES, INC.            *

and                                             *

ANDRE FERRELL                               *

and                                             *

DANIELLE SAMUELS                            *

and                                             *

**G.A. EBERLY, LLC**                            *
7157-59 Old Alexandria Ferry Road
Clinton MD 20735                            *

S/O Resident Agent:                         *
G.A. Eberly
7157-59 Old Alexandria Ferry Road           *
Clinton MD 20735                            *

    **Defendants.**                            *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

    The Plaintiffs, Gary Young, Wayne Padmore, Elizabeth Padmore, K▮▮ P▮▮▮▮▮, Z▮ P▮▮▮▮,

AXIS000261

T███ P██ and Erica Baker (hereinafter, collectively "Plaintiffs") by and through undersigned counsel, hereby file this Second Amended Complaint against Defendants Atlas West End Silver Hill LLC, Atlas West End Silver Hill Manager LLC, Gates, Hudson & Associates, Inc., Andre Ferrell, Danielle Samuels (hereinafter, collectively the "Property Defendants") as well as Capitol Boiler Works, Inc., A.O. Smith Corporation and G.A. Eberly, LLC.

## PARTIES

1. Gary Young is a resident of Prince George's County, Maryland.

2. Wayne Padmore is a resident of Prince George's County, Maryland.

3. Elizabeth Padmore is a resident of Prince George's County, Maryland.

4. K███ P████ is a resident of Prince George's County, Maryland.

5. Z██ P███ is a resident of Prince George's County, Maryland.

6. T████ P████ is a resident of Prince George's County, Maryland.

7. Erica Baker is a resident of Washington, D.C.

8. Defendant Atlas West End Silver Hill LLC ("Atlas") is a limited liability company duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland.

9. Defendant Atlas is the owner of a residential apartment complex located on the corner of Silver Hill Road and Terrace Drive in Suitland, Maryland. The apartment complex, known as the Silver Hill apartment community, is comprised of several buildings, including 3529 and 3527 Terrace Drive, Suitland, Maryland 20746 (hereinafter the "Property"), which share a common wall.

10. The 3529 Terrace Drive's main door leads to four (4) residential apartment units that are accessed by way of interior doors. Apartments A and B are located on the first floor and Apartments C and D located on the second floor at the top of a flight of stairs.

11. Apartment E in 3527 Terrace Drive is located on the basement level of the building and is accessed by way of a separate exterior door.

2

AXIS000262

12.     The Property is serviced by a fossil fuel fired boiler/hot water heater located in the Property's maintenance room (the Hot Water Heater), which is located on the basement level of 2529 Terrace Drive.

13.     Defendant Atlas West End Silver Hill Manager LLC ("Manager") is a limited liability company duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland.

14.     At all times relevant to this Complaint, Defendant Atlas and Manager operated under an agreement charging Manager with the responsibility to manage the Silver Hill apartment community, including the Property. At all times relevant to this Complaint, Manager acted on behalf of and as agent for Atlas.

15.     Defendant Gates, Hudson & Associates, Inc. ("Gates") is a limited liability company duly organized under the laws of the State of Virginia, doing business in Prince George's County, Maryland as a property management company.

16.     At all times relevant to this Complaint, Defendant Gates operated under a contract with Atlas and/or Manager to manage and operate the day-to-day activities at the Property. At all times relevant to this Complaint, Gates acted on behalf of and as agent for Atlas and Manager.

17.     Defendant Andre Ferrell ("Mr. Ferrell") is a resident of Prince Georges County, Maryland.

18.     At all times relevant to this Complaint, Defendant Mr. Ferrell was an employee of Defendant Gates, serving as the Property's maintenance technician. At all times relevant to this Complaint, Mr. Ferrell acted on behalf of himself and as an agent of Defendants Atlas, Manager and Gates.

19.     Defendant Danielle Samuels ("Ms. Samuels") is a resident of Prince Georges County, Maryland.

3

AXIS000263

20.     At all times relevant to this Complaint, Defendant Ms. Samuels was an employee of Defendant Gates, serving as the Property's manager. At all times relevant to this Complaint, Defendant Ms. Samuels acted on behalf of herself and as an agent of Defendants Atlas, Manager and Gates.

21.     Defendants Atlas, Manager, Gates, Ferrell and Samuels were responsible for the operation, maintenance and safety of the Hot Water Heater, flue venting, condensate line drainage, associated machinery and through wall penetrations located in the mechanical room of the Property.

22.     Further, Atlas, Manager, Gates, Ferrell and Samuels were responsible for the maintenance and safety of the individual apartment units located within the Property, including, but not limited to, the units' fire and carbon monoxide safety alarms.

23.     Defendant G.A. Eberly, LLC ("Eberly") is a limited liability company duly organized under the laws of the Maryland, doing business in Prince George's County, Maryland as a plumbing and heating contracting company. At all times relevant hereto, Eberly was responsible for the sale and/or installation of the Hot Water Heater, flue venting, condensate line drainage and associated machinery.

24.     Defendant Capitol Boiler Works, Inc. ("Capitol") is a limited liability company duly organized under the laws of the State of Virginia, doing business in Prince George's County, Maryland as a mechanical service and mechanical contracting company. At all times relevant hereto, Capitol was responsible for the maintenance and service of the Hot Water Heater, flue venting, condensate line drainage and associated machinery pursuant to an agreement with the Property Defendants.

25.     Defendant A.O. Smith ("A.O. Smith") is a corporation duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland as a commercial hot water heater designer, manufacturer, and wholesaler.

26.     At all times relevant to this Complaint, Plaintiffs Wayne Padmore, Elizabeth Padmore, K███ P██████, Z██ P██████, T███ P█████ and Erica Baker resided at the Property under their respective lease agreements with Defendant Gates. At all times relevant to this Complaint, Plaintiff Gary

4

AXIS000264

Young resided at the Property as a guest.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter pursuant to *inter alia*, the provisions of MD. Code Ann., Cts. & Jud. Proc. § 1-501. This Court has personal jurisdiction over the Defendants pursuant to; *inter alia*, the provisions of MD. Code Ann. Cts. & Jud. Proc. §§ 6-102 and 6-103.

28.     Venue in Prince George's County Maryland is proper pursuant to, *inter alia*, the provisions of Md. Code Ann., Cts & Jud. Proc. §§ 6-201 and 6-202.

## FACTS COMMON TO ALL COUNTS

29.     Carbon monoxide is a gas that is found in the combustion fumes that are produced when gas or fossil fuels are used for cooking or heating water or heating rooms. If a person inhales combustion fumes, his/her red blood cells will pick up the carbon monoxide more quickly than it will pick up oxygen. As a result, if combustion fumes and the accompanying high levels of carbon monoxide fill a room and are inhaled, the carbon monoxide will replace the oxygen in the individual's blood stream, damage tissues, including, but not limited to, organ tissues and brain cells, and eventually lead to death.

30.     Because carbon monoxide is colorless, tasteless and odorless, it cannot be detected without a carbon monoxide detector alarm. Carbon monoxide poisoning is the leading cause of accidental poisoning in the United States and, as a result, many states and cities throughout the country have passed laws that require carbon monoxide detectors in all homes.

31.     In Maryland, MD. Code Ann. Pub. Safety, § 12-1101 *et seq.*, requires that certain dwellings contain functioning carbon monoxide detectors. The Maryland statute allows cities and other municipalities to enact carbon monoxide detector laws that are more stringent than those set forth in the state statute.

32.     At all times relevant to this Complaint, Maryland state law required that the Property be equipped with carbon monoxide detectors: (1) outside and in the immediate vicinity of each separate

5

sleeping area; and (2) on every level of a unit, including the basement. § 12-1104(c) of Maryland, MD. Code Ann. Pub. Safety.

33.     Prince George's County has recognized the dangers posed by carbon monoxide in any dwelling that uses gas or fossil fuel for heating, cooking, hot water or clothes-drying and has mandated that all property owners install carbon monoxide detectors in all leased residences that uses gas or fossil fuel.

34.     Section 11-295 of the Building, Fire and Related Codes of Prince George's County (the "Building Code") requires that a carbon monoxide detector be provided and "must be installed near the access for each sleeping area in [any] dwelling," such as the Property, which "uses gas- or fossil-fuel for heating, cooking, hot water, or clothes-drying operations. ..."

35.     Carbon monoxide detectors were not properly installed in the Plaintiffs' units at the Property in compliance with Section 11-295 *et seq.* of the Building Code and/or § 12-1104(c) of Maryland, MD. Code Ann. Pub. Safety.

36.     At all times relevant to the Complaint, Property Defendants owned, operated, controlled, maintained and/or managed the Property and the individual apartments in which the Plaintiffs lived.

37.     At all times relevant to this Complaint, as owners, operators, controllers, maintainers and/or managers of the Property, Property Defendants were subject to the carbon monoxide alarm mandate of the Building Code and Maryland state law.

38.     Early in the week beginning January 20, 2019, some Plaintiffs began feeling ill, including suffering from headaches, nausea and/or fatigue.

39.     In the early morning hours of Thursday, January 24, 2019, a carbon monoxide detector located in Plaintiff Erica Baker's ("Ms. Baker") basement apartment alarmed.

40.     Ms. Baker called the Property's 24-hour emergency hotline and reported to Defendants that her carbon monoxide detector had alarmed. Shortly thereafter, Defendant Mr. Ferrell returned Ms.

6

AXIS000266

Baker's emergency call and falsely told Ms. Baker that the reason her carbon monoxide detector had alarmed was because its battery was low and that a low carbon monoxide detector battery did not amount to an emergency.

41.     During regular business hours of Thursday, January 24, 2019, Ms. Baker made a follow up telephone call to the Property's leasing office regarding her carbon monoxide detector having alarmed.

42.     On Thursday, January 24, 2019, hours after the detector had alerted to the presence of carbon monoxide, Mr. Ferrell entered Ms. Baker's apartment and changed the battery in her carbon monoxide detector. The Property Defendants took no steps to investigate whether carbon monoxide was leaking into the Property despite being on actual notice of the presence of carbon monoxide within the living spaces of Plaintiffs.

43.     On Saturday, January 26, 2019, Ms. Baker suffered from a headache. On that same day, January 26, 2019, the carbon monoxide detector in Ms. Baker's apartment alarmed again, whereupon Ms. Baker went to the Property's leasing office and reported the alarm to Defendant Ms. Samuels, an agent of Defendants Gates, Atlas and Manager.  Also present, was the regional manager for Defendant Gates, Mia Smith, who is an agent of Gates.

44.     Mia Smith stated to Ms. Samuels that she, Ms. Samuels, needed to "follow up on this," evidencing the Property Defendants' actual notice of the ongoing carbon monoxide leak within the Property and the hazardous condition it presented to Plaintiffs.

45.     Neither Danielle Samuels nor Mia Smith took any action to verify the presence of carbon monoxide in the Property, investigate the source of the carbon monoxide in the Property, notify the Prince George's County Fire Department/EMS ("PGFD") of the report of an alarmed carbon monoxide detector and/or evacuate the residents of the Property.

46.     In response to Ms. Baker reporting her carbon monoxide detector's repeated alarm,

7

AXIS000267

Defendants elected to disable her carbon monoxide detector so that it would no longer alarm in the presence of carbon monoxide.

47. Defendant Mr. Ferrell disabled Ms. Baker's carbon monoxide detector on Saturday, January 26, 2019. Mr. Ferrell, acting on behalf of himself and the Property Defendants, intentionally disabled the carbon monoxide detector while he knew or should have known that a carbon monoxide release into the Property was occurring. Further, Defendants took no action to investigate the source of the carbon monoxide present in Ms. Baker's apartment unit or any other area of the Property, including the common areas and/or individual units where Plaintiffs lived, or alert the fire department.

48. On Sunday, January 27, 2019, the PGFD responded to an emergency call to the Property.

49. The PGFD detected dangerous levels of carbon monoxide in the Property, including levels as high as 300 parts per million ("PPM").

50. As a result of the dangerous elevated readings of carbon monoxide, the Property was evacuated.

51. The PGFD determined that the source of the carbon monoxide was the Hot Water Heater located in the Property's mechanical room situated on the basement level of 3529 Terrace Road.

52. On Sunday, January 27, 2019, Defendant Capitol responded to the Property to determine what caused the Hot Water Heater to emit carbon monoxide into the interior of the Property and make repairs.

53. Capitol noted on its invoice for the January 27, 2019 service call that the Hot Water Heater's condensate pipe, installed for the purpose of safely draining away excess moisture, was full of water and not properly installed. The condensate line was improperly slopped towards the unit, causing water to improperly collect in the condensate pipe.

54. Capitol had previously noted the defective condition of the condensate lines when it visited the Property for a service call on March 12, 2018, which is over ten months prior to the carbon

8

AXIS000268

monoxide poisoning described above.

55.     Despite being on actual notice of water improperly collecting in the Hot Water Heater's condensate line as early as March 12, 2018, Capitol did nothing to investigate the cause and/or correct what was causing the hazardous condition.

56.     While Capitol notified the Property Defendants that the Hot Water Heater's condensate lines were improperly filling with water in March of 2018, Property Defendants did nothing to investigate the cause and/or correct what was causing the condition.

57.     During the period of time immediately before the January 2019 carbon monoxide poisoning described above, excess water collected in the Hot Water Heater's condensate line froze, causing the Hot Water Heater's exhaust flu to become restricted and/or blocked.

58.     Despite having a restricted and/or blocked exhaust flu, the Hot Water Heater continued to run (burn fossil fuel), creating combustion gases, including deadly carbon monoxide gas.

59.     The restricted and/or blocked Hot Water Heater exhaust flue coupled with the running Hot Water Heater increased pressure in the flu to such a degree that the Hot Water Heater's flu pipe popped off its fitting, releasing combustion gases, including deadly carbon monoxide, into the interior of the Property.

60.     The Hot Water Heater was designed and manufactured by Defendant A.O. Smith.

61.     A.O. Smith represented that the Hot Water Heater was designed to have and incorporated certain safety features, including an electronic control system designed to detect the presence of operational problems with the Hot Water Heater and its flue venting, drainage and associated machinery.

62.     According to A.O. Smith's intended design, in the event the Hot Water Heater's control system detects that the Hot Water Heater's combustion gas exhaust flu is blocked or restricted, the Hot Water Heater will generate a "Fault/Alert" message on an exterior panel and shut the Hot Water Heater's fossil fuel combustion off, eliminating further creation of carbon monoxide.

9

AXIS000269

63.     A "Fault/Alert" generated from a blocked or restricted exhaust flu includes messages to users to "ensure condensate hose is draining" and to "call a service professional."

64.     The presence of a "Fault/Alert" generated from a blocked or restricted combustion gas exhaust flu is designed to render the Hot Water Heater incapable of refiring unless and until its control system is reset.

65.     Despite the presence of a blocked and/or restricted exhaust flu the week of January 20, 2019, the Hot Water Heater's electronic control system's safety feature failed to detect the presence of the restricted and/or blocked flu; failed to generate a "Fault/Alert" warning a user of the hazard; and/or failed to shut the Hot Water Heater off.

66.     Despite the PGFD's determination that carbon monoxide had migrated from the mechanical room and into Plaintiffs' apartment units and the Property's common areas, and that the source of the carbon monoxide was the Hot Water Heater, Mr. Ferrell, on behalf of Defendants, falsely stated to Ms. Baker that there had *not* been a carbon monoxide leak, attributing the Property's evacuation by the PGFD to a broken "steam pipe."

67.     For a period of at least a week, the Hot Water Heater operated and maintained by Property Defendants and manufactured and installed by A.O. Smith and Eberly, respectively, discharged carbon monoxide directly into the interior of the Property rather than discharging the combustion gasses out of the Property.

68.     Carbon monoxide migrated from the Property's mechanical room through numerous through wall penetrations into the Plaintiffs' residential units and throughout the Property for various reasons, including, but not limited to, the Property Defendants' failure to properly maintain the Hot Water Heater, flue venting, condensate lines, associated machinery and through wall penetrations located in the mechanical room; the Property Defendants' failure to shut down the system when it became clear that the venting system failed, allowing carbon monoxide to escape into the Property; the Property

10

AXIS000270

Defendants' failure to place functioning carbon monoxide detectors in the Property in compliance with Maryland State law and the Building Code; Defendant Eberly's faulty installation of the Hot Water Heater, venting system, condensate lines and associated machinery; Defendant A.O. Smith's faulty design and manufacture of the Hot Water Heater and Capitol's faulty and improper maintenance of the Hot Water Heater, venting system, condensate lines and associated machinery.

69.     All Defendants' failures proximately caused Plaintiffs' carbon monoxide poisoning.

70.     For a period of at least a week, Plaintiffs were exposed to and inhaled high levels of carbon monoxide, a toxic gas.

71.     As a result of the carbon monoxide poisoning, Plaintiffs were treated by paramedics at the scene and later transported by ambulance to the hospital and, in some cases, subsequently transferred to University of Maryland Medical Center Shock Trauma Unit ("Shock Trauma") for medical evaluation and hyperbaric treatment.

72.     A person's carboxyhemoglobin level is a measure of the amount of carbon monoxide which has been absorbed into the blood stream.

73.     At the time the PGFD checked Plaintiff Gary Young, he had a carboxyhemoglobin level of 27% as well as an elevated heart rate and blood pressure. Mr. Young had become severely ill in the days leading up to January 27, ultimately losing consciousness that day, because of the toxic levels of carbon monoxide in the apartment where he slept. Mr. Young was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

74.     At the time the PGFD checked Plaintiff Wayne Padmore, he had a carboxyhemoglobin level of 25%. Mr. Padmore suffered from nausea, vomiting and a headache during the four (4) days leading up to January 27, including vomiting in front of the PGFD that day, because of the toxic levels of carbon monoxide in his apartment. Mr. Padmore was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

AXIS000271

75.    At the time the PGFD checked Plaintiff Elizabeth Padmore, she had a carboxyhemoglobin level of 23%. Ms. Young had become severely ill in the days leading up to January 27 because of the toxic levels of carbon monoxide in her apartment.  Ms. Padmore was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

76.    Twin Plaintiffs K█ P█████ and Z█ P██████, both six years old at the time of the incident, were poisoned with carbon monoxide that had migrated into their apartment. The PGFD was unable to take a carboxyhemoglobin level for the twins at the time the PGFD responded to the Property, however, both children were tested hours later at the hospital.

77.    Plaintiff K█ P████████ carboxyhemoglobin level was 3.8% at 3:53 a.m., hours after being evacuated from the Property. K██ P████ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

78.    Plaintiff Z█ P██████ carboxyhemoglobin level was 3.9% at 4:34 a.m., hours after being evacuated from the Property. Z██ P█████ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

79.    Plaintiff T█████ P█████ who was three years old at the time of the incident, was poisoned with carbon monoxide that had migrated into her apartment. The PGFD was unable to take a carboxyhemoglobin level for T█████ at the time the PGFD responded to the Property, however, she was tested hours later at the hospital.

80.    Plaintiff T█████ P██████ carboxyhemoglobin level was 3.3% at 3:49 a.m., hours after being evacuated from the Property. T█████ P█████ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

81.    At the time the PGFD checked Plaintiff Erica Baker on the night PGFD responded to the Property, she had a carboxyhemoglobin level of 11%. Plaintiff Erica Baker's basement level apartment at the Property shared a wall with a mechanical room that shared a wall with the mechanical room that

12

AXIS000272

housed the Hot Water Heater. The mechanical room that housed the Hot Water Heater had numerous penetrations through its walls and ceiling, providing a direct path for the carbon monoxide to migrate to Plaintiffs' apartment units. On more than one occasion, Ms. Baker notified Defendants that a carbon monoxide detector located in her apartment had alarmed. On each occasion that Ms. Baker complained of the alarm sounding, Defendants assured her that there had not been a carbon monoxide leak and that there was no danger. Ms. Baker had become severely ill in the days leading up to January 27 because of the high levels of carbon monoxide in her apartment.

82. All Plaintiffs suffered organ damage and a toxic brain injury as a result of this carbon monoxide poisoning, resulting in difficulty with balance, endurance, reasoning, judgment, attention, memory, communication and/or cognitive abilities.

83. Plaintiffs suffered and continue to suffer severe and permanent injuries from carbon monoxide poisoning and exposure.

## COUNT I: NEGLIGENCE
### (Plaintiffs v. Property Defendants)

84. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

85. Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to exercise reasonable care, and to provide a safe and healthy environment.

86. Property Defendants breached their duty by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would

13

AXIS000273

operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

87. Property Defendants knew or should have known that a breach of these duties would result in exposing Plaintiffs to deadly levels of carbon monoxide, creating an unreasonable risk of physical harm to the Plaintiffs.

88. A carbon monoxide detector was present on the Property, albeit not in compliance with state and local laws, and went off days prior to the incident in question, however, Property Defendants did nothing to address the level of carbon monoxide in the Property and/or stop the leakage of the deadly gas.

89. Prior to the date of this incident, Property Defendants knew that a carbon monoxide detector had alarmed yet took no action to discover why the detector had alarmed, or whether carbon monoxide was in the Property. Instead, Property Defendants shockingly disabled the alarm, causing carbon monoxide to continue to seep throughout Plaintiffs' homes undetected.

90. Property Defendants had a non-delegable duty to install carbon monoxide detectors in compliance with Maryland State law and the Building Code. Defendants knew or should have known that carbon monoxide detectors were installed in violation of the state and local law, presented an unreasonable risk to the health and safety of the Plaintiffs and social guests in the Property and created

14

AXIS000274

a false sense of safety for the Plaintiffs.

91.     Property Defendants breached their duty to the Plaintiffs by failing to supply and install carbon monoxide detectors in compliance with Maryland State law and the Building Code and disabling the carbon monoxide detector that did alarm to the presence of the deadly gas. These breaches of duty created an unreasonable risk of physical harm to the Plaintiffs and social guests in the Property.

92.     The Property Defendants knew or should have known that a breach of these duties would result in exposing the residents and social guests, including the Plaintiffs, to dangerous levels of carbon monoxide, creating an unreasonable risk of physical harm to the Plaintiffs.

93.     As a proximate and foreseeable result of the negligent failure to properly supply, install and maintain carbon monoxide detectors in compliance with state and local law, deadly carbon monoxide gas was introduced into the Property, where it was inhaled by the Plaintiffs, causing damages, including but not limited to: brain damage, organ damage, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries and damages to be proven at trial.

94.     The Property Defendants breached their duties owed to the Plaintiffs, and the Property Defendants' conduct resulted in the release of deadly carbon monoxide that physically harmed the Plaintiffs.

95.     The mechanical room, including, but not limited to, the Hot Water Heater, venting system, condensate lines and exhaust gas flue, were, at all times relevant hereto, under the exclusive control of Property Defendants.

96.     The release of deadly levels of carbon monoxide from the mechanical room was the type of accident which does not ordinarily occur unless the persons exercising control have been negligent.

97.     The Property Defendants' negligence was a direct and proximate cause of the Plaintiffs'

15

AXIS000275

permanent injuries. The Plaintiffs are entitled to recover damages including, but not limited to, pain and suffering, lost wages, loss of earning capacity, medical expenses and damages for all other losses and injuries caused by Property Defendants.

98. All of these damages were the result of wrongful conduct of the Property Defendants without any negligence by the Plaintiffs, including the negligent failure of the Property Defendants to supply, install and maintain carbon monoxide detectors in compliance with state and local law.

99. The above negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto. All of the aforesaid damages are the result of the wrongful conduct by Property Defendants.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT II: PREMISES LIABILITY
### (Plaintiffs v. Property Defendants)

100. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

101. At all times relevant to this Complaint, Plaintiffs were lawfully in their units as occupants, guests and/or lessees of the Property.

16

AXIS000276

102.    The Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to *inter alia*, maintain the Hot Water Heater, the mechanical room, venting system, condensate lines and flue system.

103.    Property Defendants owed a duty to provide a safe environment for their lessees and guests.

104.    Property Defendants' owed duty to provide a safe environment for lessees and guests is non-delegable.

105.    The Property Defendants breached their duty by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

106.    Property Defendants knew or should have known that a breach of these duties would result in exposing the Plaintiffs to deadly levels of carbon monoxide, creating an unreasonable risk of

17

AXIS000277

physical harm to the Plaintiffs.

107.    Property Defendants breached their duties owed to Plaintiffs, and Property Defendants' conduct resulted in the release of deadly carbon monoxide that physically harmed the Plaintiffs.

108.    The Plaintiffs could not, by using any degree of ordinary care, have discovered the defects at the Property.

109.    The Property Defendants' conduct was a direct and proximate cause of Plaintiffs' permanent injuries. The Plaintiffs are entitled to recover damages including, but not limited to, pain and suffering, lost wages, loss of earning capacity, medical expenses and damages for all other losses and injuries caused by the Property Defendants.

110.    The release of deadly levels of carbon monoxide from the mechanical room was the type of accident which does not ordinarily occur unless the persons exercising control have been negligent.

111.    The above intentional and grossly negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto. All of the aforesaid damages are the result of the wrongful conduct by Property Defendants.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT III: STRICT LIABILITY

18

AXIS000278

**(Plaintiffs v. Property Defendants)**

112.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

113.    At all times relevant to this Complaint, Plaintiffs were lawfully in their units as occupants, guests and/or lessees at the Property.

114.    Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to *inter alia*, maintain the Hot Water Heater, the mechanical room, venting system, condensate lines and flue system.

115.    Property Defendants owed Plaintiffs a non-delegable duty to provide a safe environment for its lessees and foreseeable guests.

116.    Property Defendants had control of the Hot Water Heater system and mechanical room at the Property.  Property Defendants engaged in an abnormally dangerous activity, which exposed Plaintiffs to an unreasonable risk of harm, by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon

19

AXIS000279

monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

117.    The Property Defendants breached their duty by failing to protect its lessees and their guests from exposure to carbon monoxide gas.

118.    As a proximate and foreseeable result of Property Defendants' abnormally dangerous activity of failing to repair and/or maintain the Hot Water Heater system, flu vent, condensate lines and related machinery, while on actual notice of the systems' faulty installation, the Hot Water Heater malfunctioned and emitted deadly carbon monoxide gas into Plaintiffs' units.

119.    As a further proximate and foreseeable result of Property Defendants' abnormally dangerous activity of disabling a carbon monoxide detector located on the Property, the carbon monoxide detector failed to alarm Plaintiffs to the presence of deadly carbon monoxide, extending the time each Plaintiff was exposed to the deadly gas.

120.    As a result of Plaintiffs inhaling the emitted carbon monoxide, Plaintiffs incurred, *inter alia*, pain and suffering, lost wages, loss of earning capacity, and medical expenses and damages.

121.    All of the aforesaid damages were the result of the wrongful conduct of Property Defendants without any negligence by the Plaintiffs.

122.    The above intentional and grossly negligent acts were wanton and reckless and were with complete disregard to the health safety and well-being of Plaintiffs. Plaintiffs have suffered serious and painful injuries that are permanent in nature. The above intentional and grossly negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other

20

injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

<u>**COUNT IV: PUNITIVE DAMAGES**</u>
**(Plaintiffs v. Property Defendants)**

123. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

124. Property Defendants owed a duty under Maryland common law as well as State and local regulations to provide a safe living environment and to properly supply and install carbon monoxide detectors in all its units, including Plaintiffs' units. Portions of the Property and Plaintiffs' units either lacked a carbon monoxide detector entirely or included a carbon monoxide detector that failed to comply with Maryland State law and the Building Code. Further, on more than one occasion prior to this incident, Property Defendants told one or more residents it was safe to go back into their unit when a carbon monoxide detector had alarmed.

125. Further, Property Defendants disabled a carbon monoxide detector that had alarmed to the presence of carbon monoxide.

126. Property Defendants knew or should have known that if a carbon monoxide detector(s) alarms, the Property evacuated and all potential areas where carbon monoxide gas can potentially emanate should be checked and rechecked for potential leakage. Property Defendants' intentional disabling of a carbon monoxide detector that had alarmed and Property Defendants' failure to check the potential sources of carbon monoxide leakage is in direct violation of Maryland law and the Building

21

AXIS000281

Code regarding the safety of its residents and is so gross and wanton, under the facts, as to entitle Plaintiffs to punitive damages.

127. As a result of the above conduct, Property Defendants' actions were in violation of the State and Local regulations and created a substantial risk of death or serious physical injury to Plaintiffs and others. Such violation of a statutory duty establishes a *prima facie* case and demonstrates a reckless disregard for Plaintiffs' safely, entitling Plaintiffs to punitive damages.

128. As a result of Property Defendants' reckless actions, Plaintiffs suffered personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

129. Property Defendants' intentional failure to properly install the carbon monoxide detectors, intentional disabling of a carbon monoxide detector that had alarmed to the presence of carbon monoxide and failure to investigate the potential sources of the carbon monoxide leakage and evacuate the Property when its management crew had more than enough notice is a direct and proximate cause of Plaintiffs' physical injuries and mental suffering.

130. As a direct result of Property Defendants' aforesaid conduct, Plaintiffs seek punitive damages.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs punitive damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT V: BATTERY

22

**(Plaintiffs v. Property Defendants)**

131. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

132. Such intentional and deliberate acts by Property Defendants and/or the agents, servants, and/or employees of Property Defendants, were foreseeable by Property Defendants and performed with actual malice and caused the Hot Water Heater to continue to operate while spewing carbon monoxide at increasing levels into the mechanical room, into the Plaintiffs' units, and, ultimately, into Plaintiffs' lungs.

133. Such intentional and deliberate actions by Property Defendants and/or the agents, servants, and/or employees of Property Defendants, constituted an offensive, intentional touching of Plaintiffs and was without the consent of Plaintiffs.

134. Such intentional and deliberate actions by Property Defendants and/or the agents, servants, and/or employees of Property Defendants caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VI: NEGLIGENCE

23

**(Plaintiffs v. Capitol)**

135. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

136. At all times relevant herein, Defendant Capitol, including, but not limited to, their agents, servants and/or employees, were in the business of selling, distributing, installing, maintaining, altering, and repairing water heaters and related flue venting, condensate lines and associated machinery.

137. Defendant Capitol, including but not limited to their agents, servants and/or employees, performed the maintenance, inspections, modifications, alterations, and repairs to the Hot Water Heater, its flu venting system, condensate lines and associated machinery after the Hot Water Heater's installation.

138. While staying at the Property, Plaintiffs were consumers who used the Hot Water Heater for hot water and were in close proximity to its operation.

139. It was foreseeable to Defendant Capitol, including but not limited to their agents, servants and/or employees, that if the Hot Water Heater was used with the method of installation used at the Property, used with the method of service and maintenance provided by Capitol, or if it was used in a situation where persons would be in close proximity to it, it would result in a dangerous condition that would be hazardous to others.

140. At all relevant times herein, Defendant Capitol, including but not limited to their agents, servants and/or employees, owed Plaintiffs a duty to use reasonable care in maintaining, inspecting, modifying, repairing, and maintaining the Hot Water Heater and related flue venting, condensate lines and associated machinery.

141. Defendant Capitol, including, but not limited to, their agents, servants and/or employees, breached their duty of care owed to Plaintiffs and other users of the hot water heating system at the Property when they acted in a negligent manner including, but not limited to, the following:

24

(a)    Failing to use reasonable care to inspect, repair, modify and/or maintain the Hot Water Heater, flue venting, condensate lines, and associated machinery in a manner that was safe for its intended and foreseeable use, not defective and/or not unreasonably dangerous;

(b)    Failing to use reasonable care to adequately warn foreseeable users and individuals such as the Plaintiffs who would be in close proximity to and/or impacted by the operation of the Hot Water Heater, of the dangers and potential dangers that were known and/or reasonably foreseeable and/or suspected in connection with the Hot Water Heater and/or its use, including but not limited to carbon monoxide poisoning;

(c)    Failing to timely discover and/or correct the defects and/or dangerous condition existing with the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(d)    Failing to comply with and/or use reasonable care to comply with the standards of care, including accepted industry standards, connected to the maintenance of the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(e)    Failing to provide proper instructions for the safe use, adjustment, and maintenance of the Hot Water Heater, including but not limited to, how to respond to fault codes generated by the Hot Water Heater's control system;

(f)    Failing to use reasonable care to timely correct or otherwise prevent the continued use of the Hot Water Heater installed in a defective and/or unreasonably dangerous condition;

(g)    Failing to use reasonable care to investigate and correct the cause of water accumulating in the Hot Water Heater's condensate lines;

25

AXIS000285

(h)     Failure to use reasonable care to make the Hot Water Heater safe and/or incorporate safeguards to ensure the Hot Water Heater and related flue venting, condensate lines, and associated machinery were safe, not defective and/or unreasonably dangerous, including but not limited to, the accumulation of water in the condensate lines, the blockage of the flu, the production of dangerous and/or lethal levels of carbon monoxide and/or the ability of the flu pipe to become disconnected while operating;

(i)     Failing to provide adequate warnings regarding known or reasonably foreseeable misuses of the Hot Water Heater or instructions regarding the safe use of the Hot Water Heater;

(j)     Failing to properly maintain the Hot Water Heater in a manner so as not to render it defective and/or unreasonably dangerous; and

(k)     Failing to install maintain the Hot Water Heater in the manner consistent with the applicable codes, regulations, industry standards, and manufacturer's specifications.

142.    Defendant Capitol, including but not limited to their agents, servants and/or employees' negligence, negligent conduct and negligent breach of their duties proximately caused the injuries to Plaintiffs, without any negligence on the part of any Plaintiff contributing thereto.

143.    As a direct and proximate result of the negligence of Defendant Capitol, including but not limited to their agents, servants and/or employees, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

AXIS000286

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendant Capitol, finding Defendant Capitol liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VII: STRICT LIABILITY

### (Plaintiffs v. Defendants A.O. Smith and Eberly)

144.     Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

145.     At all times relevant to this case, Defendants A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees designed, manufactured, assembled, distributed, sold, installed and/or placed in the stream of commerce the Hot Water Heater, which was defective and unreasonably dangerous for which they are strictly liable.

146.     The Hot Water Heater was:

a)      Defectively designed;

b)      Defectively manufactured, modified, altered and/or converted;

c)      Not for sale for its intended use;

d)      Lacked functional, proper and necessary safeguards to ensure safe operation;

e)      Lacked adequate warnings necessary for safe and proper use;

f)      Lacked adequate warnings and instructions to ensure proper application, assembly, installation, maintenance, safe use and the avoidance of foreseeable hazards so as to allow operation of the unit in a safe manner;

g)      Did not contain sufficient safeguards, including but not limited to, a shutoff mechanism sufficiently designed and calibrated to prevent the unit from

27

AXIS000287

producing and distributing excessive and lethal amounts of carbon monoxide when its exhaust flu is blocked;

h)      Did not contain sufficient mechanisms to prevent the unit from being used, adjusted, modified, misused and/or converted in a manner that would produce and distribute excessive and/or lethal amounts of carbon monoxide when its exhaust flu was blocked;

i)      Did not contain sufficient, adequate warnings to advise users and those in close proximity to the unit that the unit was defective and unreasonably dangerous in nature or warn of the dangers of operating the unit;

j)      Lacked appropriate safety mechanisms to prevent the exhaust flue pipe from becoming dislodged from the unit, thereby allowing the carbon monoxide to improperly be distributed in the Property; and

k)      Was defective and unreasonably dangerous and caused and created an unreasonably dangerous condition and threat to persons.

147.    Defendants A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, placed the Hot Water Heater in the stream of commerce knowing and expecting, and/or with reason to know that the Hot Water Heater, which they designed, manufactured, distributed, supplied, installed and/or sold, if used in particular applications or in close proximity to persons, would create an unreasonably dangerous and defective condition unknown to them.

148.    At the time of the Plaintiffs' injuries, the Hot Water Heater was in substantially the same defective and unreasonably dangerous condition as it existed when it was designed, manufactured, distributed, supplied, sold and/or otherwise placed into the stream of commerce by Defendants A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees.

149.    The Hot Water Heater was expected to and in fact was installed in the Property without

28

AXIS000288

substantial change in its condition, presenting a hazard to users without their knowledge.

150.    The Plaintiffs' injuries are a direct and proximate result of the design, manufacture, distribution, supply and sale of the Hot Water Heater which created an unreasonably dangerous condition that exposed each sickened Plaintiff to an unreasonable risk of injury, harm, and death for which Defendants A.O. Smith and Eberly are strictly liable.

151.    The unreasonably dangerous condition created by the Hot Water Heater, which rendered it unsafe, unfit, and unreasonably dangerous was known to and/or should have been anticipated by Defendants A.O. Smith and Eberly.

152.    As a direct and proximate result of the conduct of Defendants A.O. Smith and Eberly, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, social withdrawal, and other injuries, with no negligence of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendants A.O. Smith and Eberly, finding Defendants A.O. Smith and Eberly jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VIII: BREACH OF EXPRESS WARRANTY
### (Plaintiffs v. Defendants A.O. Smith and Eberly)

153.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

154.    At all times relevant to this Complaint, Defendants A.O. Smith and Eberly expressly

AXIS000289

warranted that the Hot Water Heater, which was manufactured and sold to be used at locations where the sickened Plaintiffs and others were foreseeably known to use this product or be in close proximity to the use of this product, and its component parts were of merchantable quality, and the product was fit, safe, and in proper condition for the ordinary use for which it was sold, designed, manufactured, and/or used.

155. In reliance upon such express warranty, consumers and users of the Hot Water Heater, such as the Property Defendants and/or the sickened Plaintiffs, used the Hot Water Heater and stayed in close proximity to the same, believing that this could be done safely and without risk of injury.

156. The Hot Water Heater was not of merchantable quality and/or for use, but rather was unfit, unsafe and was dangerous in the manner and for the use intended by exposing users and individuals near and about the Hot Water Heater to high, dangerous, and potentially lethal levels of carbon monoxide which could and did result in injuries.

157. Defendants A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, knew and/or had reason to know that the Hot Water Heater was unsafe and potentially could expose persons near the product to risk of injury and/or death.

158. As a direct and proximate result of Defendant A.O. Smith's and Eberly's breach of express warranties, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiffs contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendants A.O. Smith and Eberly, finding Defendants A.O. Smith and Eberly jointly and

30

AXIS000290

severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT IX: BREACH OF IMPLIED WARRANTY
### (Plaintiffs v. Defendants A.O. Smith and Eberly)

159.     Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

160.     At all times relevant to this Complaint, Defendants A.O. Smith and Eberly marketed, sold, and distributed the Hot Water Heater and knew of the use for which the product was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

161.     Plaintiffs reasonably relied upon the skill, judgment, knowledge, and representation of Defendants A.O. Smith and Eberly as to whether it would be safe to use the Hot Water Heater, and that it was indeed of merchantable quality and safe and fit for its intended use.

162.     Plaintiffs reasonably relied upon the skill, judgment, knowledge, and representation of Defendants A.O. Smith and Eberly, including, but not limited to, its agents, servants and/or employees in selecting the Hot Water Heater for use.

163.     Contrary to the implied warranties, the Hot Water Heater was not of merchantable quality or safe or fit for its intended use, because the product was and is unreasonably dangerous and unfit for the use for which it was intended.

164.     Defendants A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, knew and/or had reason to know that the Hot Water Heater was unsafe and potentially could expose persons near the product to risk of injury and/or death.

165.     As a direct and proximate result of the Defendant A.O. Smith's and Eberly's breach of implied warranties, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain

31

AXIS000291

injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiffs contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendant A.O. Smith, finding Defendants A.O. Smith and Eberly jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT X: BREACH OF LEASE

**(Wayne Padmore, Elizabeth Padmore, K___ P_____, Z___ P_____, T_____ P_____ and
Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC,
and Atlas West End Silver Hill Manager LLC)**

166.    Wayne Padmore, Elizabeth Padmore, K___ P_____, Z___ P_____ T___ P_____ and Erica Baker ("Tenants") repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

167.    Tenants entered into contracts to lease their respective apartment units at the Property pursuant to their lease agreements.

168.    Tenants had lease agreements in place with Defendants Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC and Atlas West End Silver Hill Manager LLC ("Lessors"), whereby Tenants would tender monthly rent payments to Lessors, and in return, Lessors were to provide a habitable residence. The lease agreements set forth contractual obligations for Lessors, which included, but were not limited to, maintaining fixtures, hot water, heating and A/C equipment; substantially complying with applicable federal, state, and local laws regarding safety; and make all reasonable

AXIS000292

repairs; as well as installing and maintaining the Hot Water Heater in a manner that did not harm Tenants.

169. Tenants did tender monthly rental payments to Lessors pursuant to their respective lease agreements.

170. Lessors materially breached the lease agreements in place with Tenants by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

171. As a result of Lessors' breach, Tenants suffered serious harm as more thoroughly described above and below.

**WHEREFORE**, Tenants demand that this Court enter judgment in favor of Tenants and against Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs

33

AXIS000293

and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT XI: PRIVATE ACTION FOR NUISANCE

**(Wayne Padmore, Elizabeth Padmore, K███ P███████, Z██ P███████, T█████ P█████e and Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC, and Atlas West End Silver Hill Manager LLC)**

172. Tenants incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

173. Lessors intended to cause, and/or set into motion forces which caused, the Hot Water Heater to continue to operate while spewing carbon monoxide with actual knowledge of the presence of carbon monoxide in the Property.

174. Lessors intended to cause the Hot Water Heater to continue to operate while spewing carbon monoxide when they ignored the carbon monoxide detector that had alarmed to the presence of carbon monoxide coming from the unit, ultimately disabling the detector so that it would no longer function.

175. Lessors' intentional and deliberate acts caused the Hot Water Heater to continue to operate while spewing carbon monoxide at increasing levels into the mechanical room, into the Tenants' units, and made contact with them by traveling into their lungs.

176. Such intentional and deliberate acts by Lessors and/or agents, servants and/or employees of Lessors interfered with the Tenants' use and enjoyment of their property by permeating carbon monoxide throughout the units and the Property's common areas, and thereby causing permanent sickness, ill health and brain damage.

177. The interference with Tenants' use and enjoyment of the Property was real, substantial and unreasonable and performed with actual malice, because it led to not only the Tenants' loss of the use and enjoyment of their property but also Tenants' ill health, permanent brain damage and sickness requiring a lifetime of care.

34

AXIS000294

178.    As a result of the intentional and deliberate actions of Lessors and/or the agents, servants, and/or employees of Lessors, Tenants lost the use and enjoyment of their property and also suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

179.    As a result, Tenants suffered physical injuries, pain and suffering, severe mental anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for medical and related expenses, lost wages, and other costs and expenses.

**WHEREFORE**, Tenants demand that this Court enter judgment in favor of Tenants and against Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT XII: TRESPASS
**(Wayne Padmore, Elizabeth Padmore, K███ P██████, Z██ P████████ T█████ P████e and
Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC,
and Atlas West End Silver Hill Manager LLC)**

180.    Tenants incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

181.    Tenants had the right to possess their units in the Property, and thereby, had possessory interest in their units in the Property.

182.    The Lessors' acts and omissions resulting in the release of carbon monoxide, and their failure to remediate the release, was intentional and done with actual malice, causing Tenants' units to be contaminated with carbon monoxide.

183.    The carbon monoxide present in the Tenants' units came from the Hot Water Heater

35

operated by Lessors.

184.    The invasion and presence of the carbon monoxide in the Tenants' units was caused by Lessors without consent, permission or authority from Tenants.

185.    The mere presence of the carbon monoxide in the Tenants' units constitutes trespass.

186.    The Lessors' past and continuing trespass upon the Property proximately caused Tenants to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Tenants demand that this Court enter judgment in favor of Tenants and against Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT XIII: NEGLIGENCE
### (Plaintiffs v. Eberly)

187.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

188.    At all times relevant herein, Defendant Eberly, including, but not limited to, their agents, servants and/or employees, were in the business of selling, distributing and installing, maintaining, altering, and repairing water heaters and related flue venting, condensate lines and associated machinery.

189.    Defendant Eberly, including but not limited to their agents, servants and/or employees, marketed, sold and performed the installation of the Hot Water Heater, including, but not limited to, its flu venting system, condensate lines and associated machinery as well as performed inspections,

36

modifications, alterations, and repairs to the Hot Water Heater, its flu venting system, condensate lines and associated machinery, prior to, during and/or after the Hot Water Heater's installation.

190. While staying at the Property, Plaintiffs were consumers who used the Hot Water Heater for hot water and were in close proximity to its operation.

191. It was foreseeable to Defendant Eberly, including but not limited to their agents, servants and/or employees, that if the Hot Water Heater was used with the method of installation used at the Property, or if it was used in a situation where persons would be in close proximity to it, it would result in a dangerous condition that would be hazardous to others.

192. At all relevant times herein, Defendant Eberly, including but not limited to their agents, servants and/or employees, owed Plaintiffs a duty to use reasonable care in installing, inspecting, modifying, repairing, and maintaining the Hot Water Heater and related flue venting, condensate lines and associated machinery.

193. Defendant Eberly, including, but not limited to, their agents, servants and/or employees, breached their duty of care owed to Plaintiffs and other users of the hot water heating system at the Property when they acted in a negligent manner including, but not limited to, the following:

       (a)    Failing to use reasonable care to install, inspect, repair, modify and/or maintain the Hot Water Heater, flue venting, condensate lines, and associated machinery in a manner that was safe for its intended and foreseeable use, not defective and/or not unreasonably dangerous;

       (b)    Failing to use reasonable care to adequately warn foreseeable users, purchasers and individuals such as the Plaintiffs who would be in close proximity to and/or impacted by the operation of the Hot Water Heater, of the dangers and potential dangers that were known and/or reasonably foreseeable and/or suspected in connection with the Hot Water Heater and/or its use, including but not limited to carbon monoxide

37

AXIS000297

poisoning;

(c)    Failing to timely discover and/or correct the defects and/or dangerous condition existing with the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(d)    Failing to comply with and/or use reasonable care to comply with the standards of care, including accepted industry standards, connected to the installation and maintenance of the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(e)    Failing to provide proper instructions for the safe use, installation, adjustment, and maintenance of the Hot Water Heater, including but not limited to, how to respond to fault codes generated by the Hot Water Heater's control system;

(f)    Failing to use reasonable care to timely recall, correct or otherwise prevent the continued use of the Hot Water Heater installed in a defective and/or unreasonably dangerous condition;

(g)    Failing to use reasonable care to investigate and correct the cause of water accumulating in the Hot Water Heater's condensate lines;

(h)    Failure to use reasonable care to make the Hot Water Heater safe and/or incorporate safeguards to ensure the Hot Water Heater and related flue venting, condensate lines, and associated machinery were safe, not defective and/or unreasonably dangerous, including but not limited to, the accumulation of water in the condensate lines, the blockage of the flu, the production of dangerous and/or lethal levels of carbon monoxide and/or the ability of the flu pipe to become disconnected while operating;

(i)    Failing to provide adequate warnings regarding known or reasonably foreseeable misuses of the Hot Water Heater or instructions regarding the safe use of the

38

AXIS000298

Hot Water Heater;

> (j)     Failing to properly install and maintain the Hot Water Heater in a manner so as not to render it defective and/or unreasonably dangerous; and

> (k)     Failing to install and/or maintain the Hot Water Heater in the manner consistent with the applicable codes, regulations, industry standards, and manufacturer's specifications.

194.     Defendant Eberly, including but not limited to their agents, servants and/or employees' negligence, negligent conduct and negligent breach of their duties proximately caused the injuries to Plaintiffs, without any negligence on the part of any Plaintiff contributing thereto.

195.     As a direct and proximate result of the negligence of Defendant Eberly, including but not limited to their agents, servants and/or employees, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendant Eberly, finding Defendant Eberly liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

Respectfully submitted,

_____

William H. Murphy, III – AIS# 0404060002

39

Nicholas A. Szokoly – AIS# 0312170297
Andrew K. O'Connell – AIS #0106200194
Murphy, Falcon & Murphy
One South Street, 30th Floor
Baltimore, Maryland 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
nick.szokoly@murphyfalcon.com
billy.murphy@murphyfalcon.com
andrew.oconnell@murphyfalcon.com


_____
Alan J. Mensh – AIS# 9212160224
Ashcraft & Gerel, LLP
120 E. Baltimore Street, Suite 1802
Baltimore, Maryland 21202
Telephone: (410) 385-3280
Facsimile: (410) 547-1261
AMensh@ashcraftlaw.com

*Attorneys for Plaintiffs*

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury in this matter.


_____
Andrew K. O'Connell – AIS #0106200194

Dated July _____, 2021

AXIS000300

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY,** on this ___ day of July 2021, that a copy of the foregoing Second Amended Complaint and Demand for Jury Trial along with a redlined copy was served via email and first-class mail, postage prepaid, upon:

Jennifer A. King, Esq.
DeCaro, Doran, Siciliano, Gallagher &
  DeBlasis, LLP
17251 Melford Boulevard, Suite 200
Bowie, Maryland 20715
jking@decarodoran.com
*Attorneys for Atlas West End Silver Hill, LLC*
*and Atlas West End Silver Hill Manager, LLC*

David J. Quigg, Esq.
Jessica P. Butkera, Esq.
DeHay & Elliston, LLP
36 S. Charles Street, Suite 1400
Baltimore, Maryland 21201
dquigg@dehay.com
jbutkera@dehay.com
*Attorneys for A.O. Smith Corporation*

Brett A. Buckwalter, Esq.
M. Andrea Olsen-Leyden, Esq.
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
babuckwalter@nilesbarton.com
*Attorneys for Defendants Gates Hudson*
*Associates, Danielle Samuels, and Andrew*
*Ferrell*

Jason Waters, Esq.
Regional Managing Partner
Sophia U. Jafrul
Wilson Elser Moskowitz Edelman & Dicker LLP
8444 Westpark Drive - Suite 510
McLean, VA 22102-5102
jason.waters@wilsonelser.com
sophia.jafrul@wilsonelser.com
Attorneys *for Capital Boiler Works, Inc.*

_____
Andrew K. O'Connell – AIS #0106200194

41

AXIS000301

## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

WAYNE PADMORE &ast;

~~and~~ &ast;

~~ELIZABETH PADMORE~~ &ast;

~~and~~ &ast; CASE NO. CAL20-14812

~~TABATHA PADMORE (a minor by her parent~~ &ast;
~~and next friend Wayne Padmore),~~ *et al.* &ast;

   **Plaintiffs,** &ast;

vs. &ast;

ATLAS WEST END SILVER HILL, LLC, et al &ast;

~~and~~ &ast;

~~1811 Silverside Road~~ &ast;
~~Wilmington, Delaware 19810~~
ATLAS WEST END SILVER HILL, LLC &ast;

and &ast;

ATLAS WEST END SILVER HILL &ast;
MANAGER, LLC
~~1811 Silverside Road~~ &ast;
~~Wilmington, Delaware 19810~~
&ast;

and &ast;

GATES, HUDSON & ASSOCIATES, INC. &ast;
~~3020 Hamaker Court, Suite 301~~
~~Fairfax, Virginia 22031~~ &ast;

and &ast;

ANDRE FERRELL &ast;
~~16032 English Oaks Ave.,~~
~~Apt. A,~~ &ast;
~~Bowie, MD 20716~~
&ast;

and &ast;

DANIELLE SAMUELS

4812 Woodford Lance
Upper Marlboro, MD 20772

and

CAPITOL BOILER WORKS, INC.
2805
Lee Highway
Fairfax, VA 22031

              Serve on

              The Corporation Trust, Incorporated
              2405 York Road
              Suite 201
              Lutherville Timonium, MD 21093-2264

and

A. O. SMITH CORPORATION
11270 West Park Pl. One Park Pl.
Milwaukee, WI 53224

              Serve on Resident Agent:
              The Prentice-Hall Corporation
              System, MA
              7 ST. PAUL STREET
              SUITE 820
              BALTIMORE MD 21202

and

G.A. EBERLY, LLC
7157-59 Old Alexandria Ferry Road
Clinton MD 20735

S/O Resident Agent:
7157-59 Old Alexandria Ferry Road
Clinton MD 20735

**Defendants.**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### ~~FIRST~~SECOND **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiffs, Gary Young, Wayne Padmore, Elizabeth Padmore, K██ P██████, Z██ P██████,

T██████ P██████ and Erica Baker (hereinafter, collectively "Plaintiffs") by and through undersigned

2

AXIS000303

counsel, hereby file this ~~Second Amended~~ Complaint against Defendants Atlas West End Silver Hill LLC, Atlas West End Silver Hill Manager LLC, Gates, Hudson & Associates, Inc., Andre Ferrell, Danielle Samuels (hereinafter, collectively the "Property Defendants") as well as Capitol Boiler Works, Inc.~~, and~~,, A.O. Smith Corporation ~~and G.A. Eberly, LLC~~.

## PARTIES

1.  Gary Young is a resident of Prince George's County, Maryland.

2.  Wayne Padmore is a resident of Prince George's County, Maryland.

3.  Elizabeth Padmore is a resident of Prince George's County, Maryland.

4.  K■■ P■■■■ is a resident of Prince George's County, Maryland.

5.  Z■ P■■■■ is a resident of Prince George's County, Maryland.

6.  T■■■ P■■ is a resident of Prince George's County, Maryland.

7.  Erica Baker is a resident of ~~Prince George's County, Maryland~~Washington, D.C.

8.  Defendant Atlas West End Silver Hill LLC ("Atlas") is a limited liability company duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland.

9.  Defendant Atlas is the owner of a residential apartment complex located on the corner of Silver Hill Road and Terrace Drive in Suitland, Maryland. The apartment complex, known as the Silver Hill apartment community, is comprised of several buildings, including 3529 ~~and 3527~~ Terrace Drive, Suitland, Maryland 20746 (hereinafter the "Property~~")~~").~~, which share a common wall.~~

10. The ~~Property's~~3529 Terrace Drive's main door leads to four (4) residential apartment units that are accessed by way of interior doors. Apartments A and B are located on the first floor and Apartments C and D are located on the second floor at the top of a flight of stairs.

11. ~~A fifth apartment unit,~~ Apartment E~~,~~ in 3527 Terrace Drive is located on the basement level of the building and is accessed by way of a separate exterior door.

12. The Property is serviced by a fossil fuel fired boiler/hot water heater located in the

3

AXIS000304

Property's maintenance room (the Hot Water Heater), which is located on the basement level ~~next to Apartment E of 2529 Terrace Drive.~~

13.     Defendant Atlas West End Silver Hill Manager LLC ("Manager") is a limited liability company duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland.

14.     At all times relevant to this Complaint, Defendant Atlas and Manager operated under an agreement charging Manager with the responsibility to manage the Silver Hill apartment community, including the Property. At all times relevant to this Complaint, Manager acted on behalf of and as agent for Atlas.

15.     Defendant Gates, Hudson & Associates, Inc. ("Gates") is a limited liability company duly organized under the laws of the State of Virginia, doing business in Prince George's County, Maryland as a property management company.

16.     At all times relevant to this Complaint, Defendant Gates operated under a contract with Atlas and/or Manager to manage and operate the day-to-day activities at the Property. At all times relevant to this Complaint, Gates acted on behalf of and as agent for Atlas and Manager.

17.     Defendant Andre Ferrell ("Mr. Ferrell") is a resident of Prince Georges County, Maryland.

18.     At all times relevant to this Complaint, Defendant Mr. Ferrell was an employee of Defendant Gates, serving as the Property's maintenance technician. At all times relevant to this Complaint, Mr. Ferrell acted on behalf of himself and as an agent of Defendants Atlas, Manager and Gates.

19.     Defendant Danielle Samuels ("Ms. Samuels") is a resident of Prince Georges County, Maryland.

20.     At all times relevant to this Complaint, Defendant Ms. Samuels was an employee of

4

Defendant Gates, serving as the Property's manager. At all times relevant to this Complaint, Defendant Ms. Samuels acted on behalf of herself and as an agent of Defendants Atlas, Manager and Gates.

21. Defendants Atlas, Manager, Gates, Ferrell and Samuels were responsible for the operation, maintenance and safety of the Hot Water Heater, flue venting, condensate line drainage, associated machinery and through wall penetrations located in the mechanical room of the Property.

22. Further, Atlas, Manager, Gates, Ferrell and Samuels were responsible for the maintenance and safety of the individual apartment units located within the Property, including, but not limited to, the units' fire and carbon monoxide safety alarms.

23. Defendant G.A. Eberly, LLC ("Eberly") is a limited liability company duly organized under the laws of the Maryland, doing business in Prince George's County, Maryland as a plumbing and heating contracting company. At all times relevant hereto, Eberly was responsible for the sale and/or installation of the Hot Water Heater, flue venting, condensate line drainage and associated machinery.

~~23.~~ 24. Defendant Capitol Boiler Works, Inc. ("Capitol") is a limited liability company duly organized under the laws of the State of Virginia, doing business in Prince George's County, Maryland as a mechanical service and mechanical contracting company. At all times relevant hereto, Capitol was responsible for the ~~installation,~~ maintenance and service of the Hot Water Heater, flue venting, condensate line drainage and associated machinery pursuant to an agreement with the Property Defendants.

~~24.~~ 25. Defendant A.O. Smith ("A.O. Smith") is a corporation duly organized under the laws of the State of Delaware, doing business in Prince George's County, Maryland as a commercial hot water heater designer, manufacturer, and wholesaler.

~~25.~~ 26. At all times relevant to this Complaint, Plaintiffs Wayne Padmore, Elizabeth Padmore, K▓ P▓▓▓, Z▓ P▓▓▓ T▓ P▓▓ and Erica Baker resided at the Property under their respective lease agreements with Defendant Gates. At all times relevant to this Complaint, Plaintiff Gary

5

Young resided at the Property as a guest.

## JURISDICTION AND VENUE

~~26.~~27. This Court has jurisdiction over this matter pursuant to *inter alia*, the provisions of MD. Code Ann., Cts. & Jud. Proc. § 1-501. This Court has personal jurisdiction over the Defendants pursuant to; *inter alia*, the provisions of MD. Code Ann. Cts. & Jud. Proc. §§ 6-102 and 6-103.

~~27.~~28. Venue in Prince George's County Maryland is proper pursuant to, *inter alia*, the provisions of Md. Code Ann., Cts & Jud. Proc. §§ 6-201 and 6-202.

## FACTS COMMON TO ALL COUNTS

~~28.~~29. Carbon monoxide is a gas that is found in the combustion fumes that are produced when gas or fossil fuels are used for cooking or heating water or heating rooms. If a person inhales combustion fumes, his/her red blood cells will pick up the carbon monoxide more quickly than it will pick up oxygen. As a result, if combustion fumes and the accompanying high levels of carbon monoxide fill a room and are inhaled, the carbon monoxide will replace the oxygen in the individual's blood stream, damage tissues, including, but not limited to, organ tissues and brain cells, and eventually lead to death.

~~29.~~30. Because carbon monoxide is colorless, tasteless and odorless, it cannot be detected without a carbon monoxide detector alarm. Carbon monoxide poisoning is the leading cause of accidental poisoning in the United States and, as a result, many states and cities throughout the country have passed laws that require carbon monoxide detectors in all homes.

~~30.~~31. In Maryland, MD. Code Ann. Pub. Safety, § 12-1101 *et seq.*, requires that certain dwellings contain functioning carbon monoxide detectors. The Maryland statute allows cities and other municipalities to enact carbon monoxide detector laws that are more stringent than those set forth in the state statute.

~~31.~~32. At all times relevant to this Complaint, Maryland state law required that the Property be equipped with carbon monoxide detectors: (1) outside and in the immediate vicinity of each separate

6

AXIS000307

sleeping area; and (2) on every level of a unit, including the basement. § 12-1104(c) of Maryland, MD. Code Ann. Pub. Safety.

~~32.~~33. Prince George's County has recognized the dangers posed by carbon monoxide in any dwelling that uses gas or fossil fuel for heating, cooking, hot water or clothes-drying and has mandated that all property owners install carbon monoxide detectors in all leased residences that uses gas or fossil fuel.

~~33.~~34. Section 11-295 of the Building, Fire and Related Codes of Prince George's County (the "Building Code") requires that a carbon monoxide detector be provided and "must be installed near the access for each sleeping area in [any] dwelling," such as the Property, which "uses gas- or fossil-fuel for heating, cooking, hot water, or clothes-drying operations. ..."

~~34.~~35. Carbon monoxide detectors were not properly installed in the Plaintiffs' units at the Property in compliance with Section 11-295 et seq. of the Building Code and/or § 12-1104(c) of Maryland, MD. Code Ann. Pub. Safety.

~~35.~~36. At all times relevant to the Complaint, Property Defendants owned, operated, controlled, maintained and/or managed the Property and the individual apartments in which the Plaintiffs lived.

~~36.~~37. At all times relevant to this Complaint, as owners, operators, controllers, maintainers and/or managers of the Property, Property Defendants were subject to the carbon monoxide alarm mandate of the Building Code and Maryland state law.

~~37.~~38. Early in the week beginning January 20, 2019, some Plaintiffs began feeling ill, including suffering from headaches, nausea and/or fatigue.

~~38.~~39. ~~Late in the evening on Wednesday, January 23, 2019, or in~~In the early morning hours of Thursday, January 24, 2019, a carbon monoxide detector located in Plaintiff Erica Baker's ("Ms. Baker") basement apartment alarmed.

~~39.~~40. Ms. Baker called the Property's 24-hour emergency hotline and reported to Defendants

7

that her carbon monoxide detector had alarmed. Shortly thereafter, Defendant Mr. Ferrell returned Ms. Baker's emergency call and falsely told Ms. Baker that the reason her carbon monoxide detector had alarmed was because its battery was low and that a low carbon monoxide detector battery did not amount to an emergency.

40. 41. During regular business hours of Thursday, January 24, 2019, Ms. Baker made a follow up telephone call to the Property's leasing office regarding her carbon monoxide detector having alarmed.

41. 42. On Thursday, January 24, 2019, hours after the detector had alerted to the presence of carbon monoxide, Mr. Ferrell entered Ms. Baker's apartment and changed the battery in her carbon monoxide detector. The Property Defendants took no steps to investigate whether carbon monoxide was leaking into the Property despite being on actual notice of the presence of carbon monoxide within the living spaces of Plaintiffs.

42. 43. On Saturday, January 26, 2019, Ms. Baker suffered from a headache. On that same day, January 26, 2019, the carbon monoxide detector in Ms. Baker's apartment alarmed again, whereupon Ms. Baker went to the Property's leasing office and reported the alarm to Defendant Ms. Samuels, an agent of Defendants Gates, Atlas and Manager. Also present, was the regional manager for Defendant Gates, Mia Smith, who is an agent of Gates.

43. 44. Mia Smith stated to Ms. Samuels that she, Ms. Samuels, needed to "follow up on this," evidencing the Property Defendants' actual notice of the ongoing carbon monoxide leak within the Property and the hazardous condition it presented to Plaintiffs.

44. 45. Neither Danielle Samuels nor Mia Smith took any action to verify the presence of carbon monoxide in the Property, investigate the source of the carbon monoxide in the Property, notify the Prince George's County Fire Department/EMS ("PGFD") of the report of an alarmed carbon monoxide detector and/or evacuate the residents of the Property.

8

AXIS000309

45. 46. In response to Ms. Baker reporting her carbon monoxide detector's repeated alarm, Defendants elected to disable her carbon monoxide detector so that it would no longer alarm in the presence of carbon monoxide.

46. 47. Defendant Mr. Ferrell disabled Ms. Baker's carbon monoxide detector on Saturday, January 26, 2019. Mr. Ferrell, acting on behalf of himself and the Property Defendants, intentionally disabled the carbon monoxide detector while he knew or should have known that a carbon monoxide release into the Property was occurring. Further, Defendants took no action to investigate the source of the carbon monoxide present in Ms. Baker's apartment unit or any other area of the Property, including the common areas and/or individual units where Plaintiffs lived, or alert the fire department.

47. 48. On Sunday, January 27, 2019, the PGFD responded to an emergency call to the Property.

48. 49. The PGFD detected dangerous levels of carbon monoxide in the Property, including levels as high as 300 parts per million ("PPM").

49. 50. As a result of the dangerous elevated readings of carbon monoxide, the Property was evacuated.

50. 51. The PGFD determined that the source of the carbon monoxide was the Hot Water Heater located in the Property's mechanical room situated on the basement level of the Property. 3529 Terrace Road.

51. 52. On Sunday, January 27, 2019, Defendant Capitol responded to the Property to determine what caused the Hot Water Heater to emit carbon monoxide into the interior of the Property and make repairs.

52. 53. Capitol noted on its invoice for the January 27, 2019 service call that the Hot Water Heater's condensate pipe, installed for the purpose of safely draining away excess moisture, was full of water and not properly installed. The condensate line was improperly slopped towards the unit, causing water to improperly collect in the condensate pipe.

9

AXIS000310

~~53~~ 54  Capitol had previously noted the defective condition of the condensate lines when it visited the Property for a service call on March 12, 2018, which is over ten months prior to the carbon monoxide poisoning described above.

~~54~~ 55  Despite being on actual notice of water improperly collecting in the Hot Water Heater's condensate line as early as March 12, 2018, Capitol did nothing to investigate the cause and/or correct what was causing the hazardous condition.

~~55~~ 56  While Capitol notified the Property Defendants that the Hot Water Heater's condensate lines were improperly filling with water in March of 2018, Property Defendants did nothing to investigate the cause and/or correct what was causing the condition.

~~56~~ 57  During the period of time immediately before the January 2019 carbon monoxide poisoning described above, excess water collected in the Hot Water Heater's condensate line froze, causing the Hot Water Heater's exhaust flu to become restricted and/or blocked.

~~57~~ 58  Despite having a restricted and/or blocked exhaust flu, the Hot Water Heater continued to run (burn fossil fuel), creating combustion gases, including deadly carbon monoxide gas.

~~58~~ 59  The restricted and/or blocked Hot Water Heater exhaust flue coupled with the running Hot Water Heater increased pressure in the flu to such a degree that the Hot Water Heater's flu pipe popped off its fitting, releasing combustion gases, including deadly carbon monoxide, into the interior of the Property.

~~59~~ 60  The Hot Water Heater was designed and manufactured by Defendant A.O. Smith.

~~60~~ 61  A.O. Smith represented that the Hot Water Heater was designed to have and incorporated certain safety features, including an electronic control system designed to detect the presence of operational problems with the Hot Water Heater and its flue venting, drainage and associated machinery.

~~61~~ 62  According to A.O. Smith's intended design, in the event the Hot Water Heater's control system detects that the Hot Water Heater's combustion gas exhaust flu is blocked or restricted, the Hot

10

AXIS000311

Water Heater will generate a "Fault/Alert" message on an exterior panel and shut the Hot Water Heater's fossil fuel combustion off, eliminating further creation of carbon monoxide.

62. 63. A "Fault/Alert" generated from a blocked or restricted exhaust flu includes messages to users to "ensure condensate hose is draining" and to "call a service professional."

63. 64. The presence of a "Fault/Alert" generated from a blocked or restricted combustion gas exhaust flu is designed to render the Hot Water Heater incapable of refiring unless and until its control system is reset.

64. 65. Despite the presence of a blocked and/or restricted exhaust flu the week of January 20, 2019, the Hot Water Heater's electronic control system's safety feature failed to detect the presence of the restricted and/or blocked flu; failed to generate a "Fault/Alert" warning a user of the hazard; and/or failed to shut the Hot Water Heater off.

65. 66. Despite the PGFD's determination that carbon monoxide had migrated from the mechanical room and into Plaintiffs' apartment units and the Property's common areas, and that the source of the carbon monoxide was the Hot Water Heater, Mr. Ferrell, on behalf of Defendants, falsely stated to Ms. Baker that there had *not* been a carbon monoxide leak, attributing the Property's evacuation by the PGFD to a broken "steam pipe."

66. 67. For a period of at least a week, the Hot Water Heater operated and maintained by Property Defendants and manufactured and installed by A.O. Smith and Capitol Eberly, respectively, discharged carbon monoxide directly into the interior of the Property rather than discharging the combustion gasses out of the Property.

67. 68. Carbon monoxide migrated from the Property's mechanical room to through numerous through wall penetrations into the Plaintiffs' residential units and throughout the Property for various reasons, including, but not limited to, the Property Defendants' failure to properly maintain the Hot Water Heater, flue venting, condensate lines, associated machinery and through wall penetrations located

11

AXIS000312

in the mechanical room; the Property Defendants' failure to shut down the system when it became clear that the venting system failed, allowing carbon monoxide to escape into the Property; the Property Defendants' failure to place ~~functioning~~ carbon monoxide detectors in the Property in compliance with Maryland State law and the Building Code; Defendant ~~A.O. Smith's faulty design and manufacture of the Hot Water Heater and Capitol's~~ ~~Eberly's~~ faulty installation of the Hot Water Heater, venting system, condensate lines and associated machinery~~;~~. Defendant A.O. Smith's faulty design and manufacture of the Hot Water Heater and Capitol's faulty and improper maintenance of the Hot Water Heater, venting system, condensate lines and associated machinery.

~~68.~~69.   All Defendants' failures proximately caused Plaintiffs' carbon monoxide poisoning.

~~69.~~70.   For a period of at least a week, Plaintiffs were exposed to and inhaled high levels of carbon monoxide, a toxic gas.

~~70.~~71.   As a result of the carbon monoxide poisoning, Plaintiffs were treated by paramedics at the scene and later transported by ambulance to the hospital and, in some cases, subsequently transferred to University of Maryland Medical Center Shock Trauma Unit ("Shock Trauma") for medical evaluation and hyperbaric treatment.

~~71.~~72.   A person's carboxyhemoglobin level is a measure of the amount of carbon monoxide which has been absorbed into the blood stream.

~~72.~~73.   At the time the PGFD checked Plaintiff Gary Young, he had a carboxyhemoglobin level of 27% as well as an elevated heart rate and blood pressure. Mr. Young had become severely ill in the days leading up to January 27, ultimately losing consciousness that day, because of the toxic levels of carbon monoxide in ~~his~~the apartment where he slept. Mr. Young was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

~~73.~~74.   At the time the PGFD checked Plaintiff Wayne Padmore, he had a carboxyhemoglobin level of 25%. Mr. Padmore suffered from nausea, vomiting and a headache during the four (4) days

12

leading up to January 27, including vomiting in front of the PGFD that day, because of the toxic levels of carbon monoxide in his apartment. Mr. Padmore was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

74.75. At the time the PGFD checked Plaintiff Elizabeth Padmore, she had a carboxyhemoglobin level of 23%. Ms. Young had become severely ill in the days leading up to January 27 because of the toxic levels of carbon monoxide in her apartment. Ms. Padmore was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

75.76. Twin Plaintiffs K█ P███ and Z█ P████, both six years old at the time of the incident, were poisoned with carbon monoxide that had migrated into their apartment. The PGFD was unable to take a carboxyhemoglobin level for the twins at the time the PGFD responded to the Property, however, both children were tested hours later at the hospital.

76.77. Plaintiff K█ P████s carboxyhemoglobin level was 3.8% at 3:53 a.m., hours after being evacuated from the Property. K█ P███ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

77.78. Plaintiff Z█ P████ carboxyhemoglobin level was 3.9% at 4:34 a.m., hours after being evacuated from the Property. Z█ P███ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

78.79. Plaintiff T███ P███ who was three years old at the time of the incident, was poisoned with carbon monoxide that had migrated into her apartment. The PGFD was unable to take a carboxyhemoglobin level for T███ at the time the PGFD responded to the Property, however, she was tested hours later at the hospital.

79.80. Plaintiff T███ P████ carboxyhemoglobin level was 3.3% at 3:49 a.m., hours after being evacuated from the Property. T███ P███ was transferred to Shock Trauma and treated in the facility's hyperbaric chamber.

13

AXIS000314

80 81. At the time the PGFD checked Plaintiff Erica Baker on the night PGFD responded to the Property, she had a carboxyhemoglobin level of 11%. Plaintiff Erica Baker's basement level apartment at the Property was directly across from shared a wall with a mechanical room that shared a wall with the mechanical room that housed the Hot Water Heater. The mechanical room that housed the Hot Water Heater had numerous penetrations through its walls and ceiling, providing a direct path for the carbon monoxide to migrate to Plaintiffs' apartment units. On more than one occasion, Ms. Baker notified Defendants that a carbon monoxide detector located in her apartment had alarmed. On each occasion that Ms. Baker complained of the alarm sounding, Defendants assured her that there had not been a carbon monoxide leak and that there was no danger. Ms. Baker had become severely ill in the days leading up to January 27 because of the high levels of carbon monoxide in her apartment.

81 82. All Plaintiffs suffered organ damage and a toxic brain injury as a result of this carbon monoxide poisoning, resulting in difficulty with balance, endurance, reasoning, judgment, attention, memory, communication and/or cognitive abilities.

82 83. Plaintiffs suffered and continue to suffer severe and permanent injuries from carbon monoxide poisoning and exposure.

### COUNT I: NEGLIGENCE
### (Plaintiffs v. Property Defendants)

83 84. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

84 85. Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to exercise reasonable care, and to provide a safe and healthy environment.

85 86. Property Defendants breached their duty by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not

14

AXIS000315

prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow, (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

86 87  Property Defendants knew or should have known that a breach of these duties would result in exposing Plaintiffs to deadly levels of carbon monoxide, creating an unreasonable risk of physical harm to the Plaintiffs.

87 88  A carbon monoxide detector was present on the Property, albeit not in compliance with state and local laws, and went off days prior to the incident in question, however, Property Defendants did nothing to address the level of carbon monoxide in the Property and/or stop the leakage of the deadly gas.

88 89  Prior to the date of this incident, Property Defendants knew that a carbon monoxide detector had alarmed, yet took no action to discover why the detector had alarmed, or whether carbon monoxide was in the Property. Instead, Property Defendants shockingly disabled the alarm, causing carbon monoxide to continue to seep throughout Plaintiffs' homes undetected.

89 90  Property Defendants had a non-delegable duty to install carbon monoxide detectors in

15

compliance with Maryland State law and the Building Code. Defendants knew or should have known that carbon monoxide detectors were installed in violation of the state and local law, presented an unreasonable risk to the health and safety of the Plaintiffs and social guests in the Property and created a false sense of safety for the Plaintiffs.

90 91. Property Defendants breached their duty to the Plaintiffs by failing to supply and install carbon monoxide detectors in compliance with Maryland State law and the Building Code and disabling the carbon monoxide detector that did alarm to the presence of the deadly gas. These breaches of duty created an unreasonable risk of physical harm to the Plaintiffs and social guests in the Property.

91 92. The Property Defendants knew or should have known that a breach of these duties would result in exposing the residents and social guests, including the Plaintiffs, to dangerous levels of carbon monoxide, creating an unreasonable risk of physical harm to the Plaintiffs.

92 93. As a proximate and foreseeable result of the negligent failure to properly supply, install and maintain carbon monoxide detectors in compliance with state and local law, deadly carbon monoxide gas was introduced into the Property, where it was inhaled by the Plaintiffs, causing damages, including but not limited to: brain damage, organ damage, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries and damages to be proven at trial.

93 94. The Property Defendants breached their duties owed to the Plaintiffs, and the Property Defendants' conduct resulted in the release of deadly carbon monoxide that physically harmed the Plaintiffs.

94 95. The mechanical room, including, but not limited to, the Hot Water Heater, venting system, condensate lines and exhaust gas flue, were, at all times relevant hereto, under the exclusive control of Property Defendants.

16

AXIS000317

~~95~~ 96. The release of deadly levels of carbon monoxide from the mechanical room was the type of accident which does not ordinarily occur unless the persons exercising control have been negligent.

~~96~~ 97. The Property Defendants' negligence was a direct and proximate cause of the Plaintiffs' permanent injuries. The Plaintiffs are entitled to recover damages including, but not limited to, pain and suffering, lost wages, loss of earning capacity, medical expenses and damages for all other losses and injuries caused by Property Defendants.

~~97~~ 98. All of these damages were the result of wrongful conduct of the Property Defendants without any negligence by the Plaintiffs, including the negligent failure of the Property Defendants to supply, install and maintain carbon monoxide detectors in compliance with state and local law.

~~98~~ 99. The above negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto. All of the aforesaid damages are the result of the wrongful conduct by Property Defendants.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT II: PREMISES LIABILITY
### (Plaintiffs v. Property Defendants)

~~99~~ 100. Plaintiffs incorporate by reference and re-allege the allegations contained in the

17

AXIS000318

preceding and subsequent paragraphs.

~~100.~~ 101.        At all times relevant to this Complaint, Plaintiffs were lawfully in their units as occupants, guests and/or lessees of the Property.

~~101.~~ 102.        The Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to *inter alia*, maintain the Hot Water Heater, the mechanical room, venting system, condensate lines and flue system.

~~102.~~ 103.        Property Defendants owed a duty to provide a safe environment for their lessees and guests.

~~103.~~ 104.        Property Defendants' owed duty to provide a safe environment for lessees and guests is non-delegable.

~~104.~~ 105.        The Property Defendants breached their duty by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to

18

evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

~~105~~ 106.    Property Defendants knew or should have known that a breach of these duties would result in exposing the Plaintiffs to deadly levels of carbon monoxide, creating an unreasonable risk of physical harm to the Plaintiffs.

~~106~~ 107.    Property Defendants breached their duties owed to Plaintiffs, and Property Defendants' conduct resulted in the release of deadly carbon monoxide that physically harmed the Plaintiffs.

~~107~~ 108.    The Plaintiffs could not, by using any degree of ordinary care, have discovered the defects at the Property.

~~108~~ 109.    The Property Defendants' conduct was a direct and proximate cause of Plaintiffs' permanent injuries. The Plaintiffs are entitled to recover damages including, but not limited to, pain and suffering, lost wages, loss of earning capacity, medical expenses and damages for all other losses and injuries caused by the Property Defendants.

~~109~~ 110.    The release of deadly levels of carbon monoxide from the mechanical room was the type of accident which does not ordinarily occur unless the persons exercising control have been negligent.

~~110~~ 111.    The above intentional and grossly negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto. All of the aforesaid damages are the result of the wrongful conduct by Property Defendants.

**WHEREFORE,** Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and

19

against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

### COUNT III: STRICT LIABILITY
#### (Plaintiffs v. Property Defendants)

~~111~~ 112.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~112~~ 113.    At all times relevant to this Complaint, Plaintiffs were lawfully in their units as occupants, guests and/or lessees at the Property.

~~113~~ 114.    Property Defendants owed a duty to Plaintiffs as occupants, guests and/or lessees of the Property, to *inter alia*, maintain the Hot Water Heater, the mechanical room, venting system, condensate lines and flue system.

~~114~~ 115.    Property Defendants owed Plaintiffs a non-delegable duty to provide a safe environment for its lessees~~,~~ and foreseeable guests.

~~115~~ 116.    Property Defendants had control of the Hot Water Heater system and mechanical room at the Property. Property Defendants engaged in an abnormally dangerous activity, which exposed Plaintiffs to an unreasonable risk of harm, by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect,

20

AXIS000321

maintain and/or repair the Hot Water Heater's vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

116. 117.    The Property Defendants breached their duty by failing to protect its lessees and their guests from exposure to carbon monoxide gas.

117. 118.    As a proximate and foreseeable result of Property Defendants' abnormally dangerous activity of failing to repair and/or maintain the Hot Water Heater system, flu vent, condensate lines and related machinery, while on actual notice of the systems' faulty installation, the Hot Water Heater malfunctioned and emitted deadly carbon monoxide gas into Plaintiffs' units.

118. 119.    As a further proximate and foreseeable result of Property Defendants' abnormally dangerous activity of disabling a carbon monoxide detector located on the Property, the carbon monoxide detector failed to alarm Plaintiffs to the presence of deadly carbon monoxide, extending the time each Plaintiff was exposed to the deadly gas.

119. 120.    As a result of Plaintiffs inhaling the emitted carbon monoxide, Plaintiffs incurred, *inter alia*, pain and suffering, lost wages, loss of earning capacity, and medical expenses and damages.

120. 121.    All of the aforesaid damages were the result of the wrongful conduct of Property Defendants without any negligence by the Plaintiffs.

121. 122.    The above intentional and grossly negligent acts were wanton and reckless and were with complete disregard to the health safety and well-being of Plaintiffs. Plaintiffs have suffered

21

AXIS000322

serious and painful injuries that are permanent in nature. The above intentional and grossly negligent acts caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT IV: PUNITIVE DAMAGES
### (Plaintiffs v. Property Defendants)

~~122~~ 123 Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~123~~ 124 Property Defendants owed a duty under Maryland common law as well as State and local regulations to provide a safe living environment and to properly supply and install carbon monoxide detectors in all its units, including Plaintiffs' units. Portions of the Property and Plaintiffs' units either lacked a carbon monoxide detector entirely or included a carbon monoxide detector that failed to comply with Maryland State law and the Building Code. Further, on more than one occasion prior to this incident, Property Defendants told one or more residents it was safe to go back into their unit when a carbon monoxide detector had alarmed.

~~124~~ 125 Further, Property Defendants disabled a carbon monoxide detector that had alarmed to the presence of carbon monoxide.

22

AXIS000323

~~125~~ 126.    Property Defendants knew or should have known that if a carbon monoxide detector(s) alarms, the Property evacuated and all potential areas where carbon monoxide gas can potentially emanate should be checked and rechecked for potential leakage. Property Defendants' intentional disabling of a carbon monoxide detector that had alarmed and Property Defendants' failure to check the potential sources of carbon monoxide leakage is in direct violation of Maryland law and the Building Code regarding the safety of its residents and is so gross and wanton, under the facts, as to entitle Plaintiffs to punitive damages.

~~126~~ 127.    As a result of the above conduct, Property Defendants' actions were in violation of the State and Local regulations and created a substantial risk of death or serious physical injury to Plaintiffs and others. Such violation of a statutory duty establishes a *prima facie* case and demonstrates a reckless disregard for Plaintiffs' safely, entitling Plaintiffs to punitive damages.

~~127~~ 128.    As a result of Property Defendants' reckless actions, Plaintiffs suffered personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

~~128~~ 129.    Property Defendants' intentional failure to properly install the carbon monoxide detectors, intentional disabling of a carbon monoxide detector that had alarmed to the presence of carbon monoxide and failure to investigate the potential sources of the carbon monoxide leakage and evacuate the Property when its management crew had more than enough notice is a direct and proximate cause of Plaintiffs' physical injuries and mental suffering.

~~129~~ 130.    As a direct result of Property Defendants' aforesaid conduct, Plaintiffs seek punitive damages.

23

AXIS000324

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs punitive damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT V: BATTERY

### (Plaintiffs v. Property Defendants)

~~130~~ 131    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~131~~ 132    Such intentional and deliberate acts by Property Defendants and/or the agents, servants, and/or employees of Property Defendants, were foreseeable by Property Defendants and performed with actual malice and caused the Hot Water Heater to continue to operate while spewing carbon monoxide at increasing levels into the mechanical room, into the Plaintiffs' units, and, ultimately, into Plaintiffs' lungs.

~~132~~ 133    Such intentional and deliberate actions by Property Defendants and/or the agents, servants, and/or employees of Property Defendants, constituted an offensive, intentional touching of Plaintiffs and was without the consent of Plaintiffs.

~~133~~ 134    Such intentional and deliberate actions by Property Defendants and/or the agents, servants, and/or employees of Property Defendants caused Plaintiffs to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and

24

AXIS000325

against Property Defendants, finding Property Defendants jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VI: NEGLIGENCE
### (Plaintiffs v. Capitol)

~~134.~~135.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~135.~~136.    At all times relevant herein, Defendant Capitol, including, but not limited to, their agents, servants and/or employees, were in the business of selling, distributing, installing, maintaining, altering, and repairing water heaters and related flue venting, condensate lines and associated machinery.

~~136.~~137.    Defendant Capitol, including but not limited to their agents, servants and/or employees, ~~marketed, sold and~~ performed the ~~installation of the Hot Water Heater, including, but not limited to, its flu venting system, condensate lines and associated machinery as well as performed~~maintenance, inspections, modifications, alterations, and repairs to the Hot Water Heater, its flu venting system, condensate lines and associated machinery, ~~prior to, during and/or~~ after the Hot Water Heater's installation.

~~137.~~138.    While staying at the Property, Plaintiffs were consumers who used the Hot Water Heater for hot water and were in close proximity to its operation.

~~138.~~139.    It was foreseeable to Defendant Capitol, including but not limited to their agents, servants and/or employees, that if the Hot Water Heater was used with the method of installation used at the Property, used with the method of service and maintenance provided by Capitol, or if it was used in a situation where persons would be in close proximity to it, it would result in a dangerous condition that would be hazardous to others.

25

AXIS000326

~~139~~ 140.    At all relevant times herein, Defendant Capitol, including but not limited to their agents, servants and/or employees, owed Plaintiffs a duty to use reasonable care in ~~installing~~maintaining, inspecting, modifying, repairing, and maintaining the Hot Water Heater and related flue venting, condensate lines and associated machinery.

~~140~~ 141.    Defendant Capitol, including, but not limited to, their agents, servants and/or employees, breached their duty of care owed to Plaintiffs and other users of the hot water heating system at the Property when they acted in a negligent manner including, but not limited to, the following:

(a)    Failing to use reasonable care to ~~install,~~inspect, repair, modify and/or maintain the Hot Water Heater, flue venting, condensate lines, and associated machinery in a manner that was safe for its intended and foreseeable use, not defective and/or not unreasonably dangerous;

(b)    Failing to use reasonable care to adequately warn foreseeable users, ~~purchasers~~ and individuals such as the Plaintiffs who would be in close proximity to and/or impacted by the operation of the Hot Water Heater, of the dangers and potential dangers that were known and/or reasonably foreseeable and/or suspected in connection with the Hot Water Heater and/or its use, including but not limited to carbon monoxide poisoning;

(c)    Failing to timely discover and/or correct the defects and/or dangerous condition existing with the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(d)    Failing to comply with and/or use reasonable care to comply with the standards of care, including accepted industry standards, connected to the ~~installation and~~ maintenance of the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

26

AXIS000327

(e)     Failing to provide proper instructions for the safe use, ~~installation,~~ adjustment, and maintenance of the Hot Water Heater, including but not limited to, how to respond to fault codes generated by the Hot Water Heater's control system;

(f)     Failing to use reasonable care to timely ~~recall,~~ correct or otherwise prevent the continued use of the Hot Water Heater installed in a defective and/or unreasonably dangerous condition;

(g)     Failing to use reasonable care to investigate and correct the cause of water accumulating in the Hot Water Heater's condensate lines;

(h)     Failure to use reasonable care to make the Hot Water Heater safe and/or incorporate safeguards to ensure the Hot Water Heater and related flue venting, condensate lines, and associated machinery were safe, not defective and/or unreasonably dangerous, including but not limited to, the accumulation of water in the condensate lines, the blockage of the flu, the production of dangerous and/or lethal levels of carbon monoxide and/or the ability of the flu pipe to become disconnected while operating;

(i)     Failing to provide adequate warnings regarding known or reasonably foreseeable misuses of the Hot Water Heater or instructions regarding the safe use of the Hot Water Heater;

(j)     Failing to properly ~~install and~~ maintain the Hot Water Heater in a manner so as not to render it defective and/or unreasonably dangerous; and

(k)     Failing to install ~~and/or~~ maintain the Hot Water Heater in the manner consistent with the applicable codes, regulations, industry standards, and manufacturer's specifications.

~~141.~~ 142.     Defendant Capitol, including but not limited to their agents, servants and/or employees' negligence, negligent conduct and negligent breach of their duties proximately caused the

27

AXIS000328

injuries to Plaintiffs, without any negligence on the part of any Plaintiff contributing thereto.

~~142.~~ 143.        As a direct and proximate result of the negligence of Defendant Capitol, including but not limited to their agents, servants and/or employees, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendant Capitol, finding Defendant Capitol liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VII: STRICT LIABILITY

### (Plaintiffs v. Defendants ~~Capitol and~~ A.O. Smith and Eberly)

~~143.~~ 144.        Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~144.~~ 145.        At all times relevant to this case, Defendants ~~Capitol and~~ A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees designed, manufactured, assembled, distributed, sold, installed and/or placed in the stream of commerce the Hot Water Heater, which ~~were~~ was defective and unreasonably dangerous for which they are strictly liable.

~~145.~~ 146.        The Hot Water Heater was:

    a)      Defectively designed;

    b)      Defectively manufactured, modified, altered and/or converted;

    c)      Not for sale for its intended use;

28

AXIS000329

d) Lacked functional, proper and necessary safeguards to ensure safe operation;

e) Lacked adequate warnings necessary for safe and proper use;

f) Lacked adequate warnings and instructions to ensure proper application, assembly, installation, maintenance, safe use and the avoidance of foreseeable hazards so as to allow operation of the unit in a safe manner;

g) Did not contain sufficient safeguards, including but not limited to, a shutoff mechanism sufficiently designed and calibrated to prevent the unit from producing and distributing excessive and lethal amounts of carbon monoxide when its exhaust flu is blocked;

h) Did not contain sufficient mechanisms to prevent the unit from being used, adjusted, modified, misused and/or converted in a manner that would produce and distribute excessive and/or lethal amounts of carbon monoxide when its exhaust flu was blocked;

i) Did not contain sufficient, adequate warnings to advise users and those in close proximity to the unit that the unit was defective and unreasonably dangerous in nature or warn of the dangers of operating the unit;

j) Lacked appropriate safety mechanisms to prevent the exhaust flue pipe from becoming dislodged from the unit, thereby allowing the carbon monoxide to improperly be distributed in the Property; and

k) Was defective and unreasonably dangerous and caused and created an unreasonably dangerous condition and threat to persons.

146.147. Defendants Capitol and A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, placed the Hot Water Heater in the stream of commerce knowing and

29

AXIS000330

expecting, and/or with reason to know that the Hot Water Heater, which they designed, manufactured, distributed, supplied, installed and/or sold, if used in particular applications or in close proximity to persons, would create an unreasonably dangerous and defective condition unknown to them.

147.148.         At the time of the Plaintiffs' injuries, the Hot Water Heater was in substantially the same defective and unreasonably dangerous condition as it existed when ~~they were~~it was designed, manufactured, distributed, supplied, sold and/or otherwise placed into the stream of commerce by Defendants ~~Capitol and~~ A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees.

148.149.         The Hot Water Heater was expected to and in fact was installed in the Property without substantial change in its condition, presenting a hazard to users without their knowledge.

149.150.         The Plaintiffs' injuries are a direct and proximate result of the design, manufacture, distribution, supply, and sale, ~~and/or defective installation~~ of the Hot Water Heater which created an unreasonably dangerous condition that exposed each sickened Plaintiff to an unreasonable risk of injury, harm, and death for which Defendants ~~Capitol and~~ A.O. Smith and Eberly are strictly liable.

150.151.         The unreasonably dangerous condition created by the Hot Water Heater, which rendered it unsafe, unfit, and unreasonably dangerous was known to and/or should have been anticipated by Defendants ~~Capitol and~~ A.O. Smith and Eberly.

151.152.         As a direct and proximate result of the conduct of Defendants ~~Capitol and~~ A.O. Smith and Eberly, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, social withdrawal, and other injuries, with no negligence of any Plaintiff contributing thereto.

30

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendants ~~Capitol and~~ A.O. Smith and Eberly, finding Defendants ~~Capitol and~~ A.O. Smith and Eberly jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT VIII: BREACH OF EXPRESS WARRANTY
### (Plaintiffs v. ~~Capitol and Defendants~~ A.O. Smith and Eberly)

~~152.~~ 153.        Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~153.~~ 154.        At all times relevant to this Complaint, Defendants ~~Capitol and~~ A.O. Smith and Eberly expressly warranted that the Hot Water Heater, which was manufactured and sold to be used at locations where the sickened Plaintiffs and others were foreseeably known to use this product or be in close proximity to the use of this product, and its component parts were of merchantable quality, and the product was fit, safe, and in proper condition for the ordinary use for which it was sold, designed, manufactured, and/or used.

~~154.~~ 155.        In reliance upon such express warranty, consumers and users of the Hot Water Heater, such as the Property Defendants and/or the sickened Plaintiffs, used the Hot Water Heater and stayed in close proximity to the same, believing that this could be done safely and without risk of injury.

~~155.~~ 156.        The Hot Water Heater was not of merchantable quality and/or for use, but rather was unfit, unsafe and was dangerous in the manner and for the use intended by exposing users and individuals near and about the Hot Water Heater to high, dangerous, and potentially lethal levels of carbon monoxide which could and did result in injuries.

~~156.~~ 157.        Defendants ~~Capitol and~~ A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, knew and/or had reason to know that the Hot Water Heater was

31

AXIS000332

unsafe and potentially could expose persons near the product to risk of injury and/or death.

~~157~~ 158    As a direct and proximate result of ~~Defendants Capitol's and Defendant~~ A.O. Smith's ~~and Eberly's~~ breach of express warranties, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiffs contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendants ~~Capitol and~~ A.O. Smith ~~and Eberly~~, finding Defendants ~~Capitol and~~ A.O. Smith ~~and Eberly~~ jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT IX: BREACH OF IMPLIED WARRANTY
### (Plaintiffs v. Defendants ~~Capitol and~~ A.O. Smith ~~and Eberly~~)

~~158~~ 159    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~159~~ 160    At all times relevant to this Complaint, Defendants ~~Capitol and~~ A.O. Smith ~~and Eberly~~ marketed, sold, and distributed the Hot Water Heater and knew of the use for which the product was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

~~160~~ 161    Plaintiffs reasonably relied upon the skill, judgment, knowledge, and representation of Defendants ~~Capitol and~~ A.O. Smith ~~and Eberly~~ as to whether it would be safe to use the Hot Water Heater, and that it was indeed of merchantable quality and safe and fit for its intended

32

AXIS000333

use.

161. 162. Plaintiffs reasonably relied upon the skill, judgment, knowledge, and representation of Defendants ~~Capitol and~~ A.O. Smith and Eberly, including, but not limited to, ~~their~~ its agents, servants and/or employees in selecting the Hot Water Heater for use.

162. 163. Contrary to the implied warranties, the Hot Water Heater was not of merchantable quality or safe or fit for its intended use, because the product was and is unreasonably dangerous and unfit for the use for which it was intended.

163. 164. Defendants ~~Capitol and~~ A.O. Smith and Eberly, including, but not limited to, their agents, servants and/or employees, knew and/or had reason to know that the Hot Water Heater was unsafe and potentially could expose persons near the product to risk of injury and/or death.

164. 165. As a direct and proximate result of the ~~Defendants Capitol's and Defendant~~ A.O. Smith's and Eberly's breach of implied warranties, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiffs contributing thereto.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against ~~Defendants Capitol and Defendant~~ A.O. Smith, finding Defendants ~~Capitol and~~ A.O. Smith and Eberly jointly and severally liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

<u>**COUNT X: BREACH OF LEASE**</u>

**(Wayne Padmore, Elizabeth Padmore, K███ P████████, Z█ P██████e, T█████ P██████ and
Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC,**

33

AXIS000334

**and Atlas West End Silver Hill Manager LLC)**

~~165~~ 166.        Wayne Padmore, Elizabeth Padmore, K█ P█████, Z█ P█████, T█ P█████ and Erica Baker ("Tenants") repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

~~166~~ 167.        Tenants entered into contracts to lease their respective apartment units at the Property pursuant to their lease agreements.

~~167~~ 168.        Tenants had lease agreements in place with Defendants Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC and Atlas West End Silver Hill Manager LLC ("Lessors"), whereby Tenants would tender monthly rent payments to Lessors, and in return, Lessors were to provide a habitable residence. The lease agreements set forth contractual obligations for Lessors, which included, but were not limited to, maintaining fixtures, hot water, heating and A/C equipment; substantially complying with applicable federal, state, and local laws regarding safety; and make all reasonable repairs; as well as installing and maintaining the Hot Water Heater in a manner that did not harm Tenants.

~~168~~ 169.        Tenants did tender monthly rental payments to Lessors pursuant to their respective lease agreements.

~~169~~ 170.        Lessors materially breached the lease agreements in place with Tenants ~~by~~ by, *inter alia* (a) installing and/or operating a venting system that did not maintain a positive air flow adequate to remove flue or vent gasses from the Hot Water Heater to the outside atmosphere; (b) installing or maintaining a draft system which did not prevent leakage of flue or vent gases into the interior of the Property; (c) failing to provide for an effective interlock system to prevent the flow of fuel to the Hot Water Heater when the mechanical draft system was not performing; (d) failing to properly inspect or maintain the Hot Water Heater so that it would operate without producing excessive amounts of carbon monoxide; (e) failing to properly install, inspect, maintain and/or repair the Hot Water Heater's

34

vent ducts and condensate lines; (f) failing to comply with local and state, and/or federal laws requiring the Hot Water Heater to be interlocked so that they cannot operate without proven airflow; (g) failing to install carbon monoxide detectors on the premises in accordance with Maryland State law and the Building Code; (h) failing to comply with the Hot Water Heater manufacturer's maintenance and inspection instructions; (i) intentionally disabling the carbon monoxide detector that had alarmed to the presence of carbon monoxide in Ms. Baker's unit; (j) failing to investigate what caused Ms. Baker's carbon monoxide detector to alarm; and (k) failing to evacuate the Property after Ms. Baker's carbon monoxide detector alarmed.

~~170.~~171.　　　As a result of Lessors' breach, Tenants suffered serious harm as more thoroughly described above and below.

**WHEREFORE**, Tenants demand that this Court enter judgment in favor of Tenants and against Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

<u>**COUNT XI: PRIVATE ACTION FOR NUISANCE**</u>
**(Wayne Padmore, Elizabeth Padmore, K   P      , Z   P     , T    P     and Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC, and Atlas West End Silver Hill Manager LLC)**

~~171.~~172.　　　Tenants incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~172.~~173.　　　Lessors intended to cause, and/or set into motion forces which caused, the Hot Water Heater to continue to operate while spewing carbon monoxide with actual knowledge of the presence of carbon monoxide in the Property.

~~173.~~174.　　　Lessors intended to cause the Hot Water Heater to continue to operate while spewing carbon monoxide when they ignored the carbon monoxide detector that had alarmed to the

35

AXIS000336

presence of carbon monoxide coming from the unit, ultimately disabling the detector so that it would no longer function.

~~174.~~175.     Lessors' intentional and deliberate acts caused the Hot Water Heater to continue to operate while spewing carbon monoxide at increasing levels into the mechanical room, into the Tenants' units, and made contact with them by traveling into their lungs.

~~175.~~176.     Such intentional and deliberate acts by Lessors and/or agents, servants and/or employees of Lessors interfered with the Tenants' use and enjoyment of their property by permeating carbon monoxide throughout the units and the Property's common areas, and thereby causing permanent sickness, ill health and brain damage.

~~176.~~177.     The interference with Tenants' use and enjoyment of the Property was real, substantial and unreasonable and performed with actual malice, because it led to not only the Tenants' loss of the use and enjoyment of their property but also Tenants' ill health, permanent brain damage and sickness requiring a lifetime of care.

~~177.~~178.     As a result of the intentional and deliberate actions of Lessors and/or the agents, servants, and/or employees of Lessors, Tenants lost the use and enjoyment of their property and also suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

~~178.~~179.     As a result, Tenants suffered physical injuries, pain and suffering, severe mental anguish, humiliation, disgrace, and loss of dignity, as well as monetary losses for medical and related expenses, lost wages, and other costs and expenses.

**WHEREFORE,** Tenants demand that this Court enter judgment in favor of Tenants and against

36

AXIS000037

Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT XII: TRESPASS

**(Wayne Padmore, Elizabeth Padmore, K███ P███████, Z██ P███████, T█████ P██████ and Erica Baker vs. Gates, Hudson & Associates, Inc., Atlas West End Silver Hill LLC, and Atlas West End Silver Hill Manager LLC)**

~~179~~ 180    Tenants incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

~~180~~ 181.    Tenants had the right to possess their units in the Property, and thereby, had possessory interest in their units in the Property.

~~181~~ 182.    The Lessors' acts and omissions resulting in the release of carbon monoxide, and their failure to remediate the release, was intentional and done with actual malice, causing Tenants' units to be contaminated with carbon monoxide.

~~182~~ 183.    The carbon monoxide present in the Tenants' units came from the Hot Water Heater operated by Lessors.

~~183~~ 184.    The invasion and presence of the carbon monoxide in the Tenants' units was caused by Lessors without consent, permission or authority from Tenants.

~~184~~ 185.    The mere presence of the carbon monoxide in the Tenants' units constitutes trespass.

~~185~~ 186.    The Lessors' past and continuing trespass upon the Property proximately caused Tenants to suffer personal injuries and to continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

37

AXIS000338

**WHEREFORE**, Tenants demand that this Court enter judgment in favor of Tenants and against Lessors, finding Lessors jointly and severally liable to Tenants and awarding Tenants compensatory damages in an amount in excess of $75,000.00, together with punitive damages, attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT XIII: NEGLIGENCE
### (Plaintiffs v. Eberly)

187.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

188.    At all times relevant herein, Defendant Eberly, including, but not limited to, their agents, servants and/or employees, were in the business of selling, distributing and installing, maintaining, altering, and repairing water heaters and related flue venting, condensate lines and associated machinery.

189.    Defendant Eberly, including but not limited to their agents, servants and/or employees, marketed, sold and performed the installation of the Hot Water Heater, including, but not limited to, its flu venting system, condensate lines and associated machinery as well as performed inspections, modifications, alterations, and repairs to the Hot Water Heater, its flu venting system, condensate lines and associated machinery, prior to, during and/or after the Hot Water Heater's installation.

190.    While staying at the Property, Plaintiffs were consumers who used the Hot Water Heater for hot water and were in close proximity to its operation.

191.    It was foreseeable to Defendant Eberly, including but not limited to their agents, servants and/or employees, that if the Hot Water Heater was used with the method of installation used at the Property, or if it was used in a situation where persons would be in close proximity to it, it would result in a dangerous condition that would be hazardous to others.

192.    At all relevant times herein, Defendant Eberly, including but not limited to their agents, servants and/or employees, owed Plaintiffs a duty to use reasonable care in installing, inspecting,

38

AXIS000339

modifying, repairing, and maintaining the Hot Water Heater and related flue venting, condensate lines and associated machinery.

193    Defendant Eberly, including, but not limited to, their agents, servants and/or employees, breached their duty of care owed to Plaintiffs and other users of the hot water heating system at the Property when they acted in a negligent manner including, but not limited to, the following:

(a)    Failing to use reasonable care to install, inspect, repair, modify and/or maintain the Hot Water Heater, flue venting, condensate lines, and associated machinery in a manner that was safe for its intended and foreseeable use, not defective and/or not unreasonably dangerous;

(b)    Failing to use reasonable care to adequately warn foreseeable users, purchasers and individuals such as the Plaintiffs who would be in close proximity to and/or impacted by the operation of the Hot Water Heater, of the dangers and potential dangers that were known and/or reasonably foreseeable and/or suspected in connection with the Hot Water Heater and/or its use, including but not limited to carbon monoxide poisoning;

(c)    Failing to timely discover and/or correct the defects and/or dangerous condition existing with the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(d)    Failing to comply with and/or use reasonable care to comply with the standards of care, including accepted industry standards, connected to the installation and maintenance of the Hot Water Heater and related flue venting, condensate lines, and associated machinery;

(e)    Failing to provide proper instructions for the safe use, installation, adjustment, and maintenance of the Hot Water Heater, including but not limited to, how

39

AXIS000340

to respond to fault codes generated by the Hot Water Heater's control system;

(f) Failing to use reasonable care to timely recall, correct or otherwise prevent the continued use of the Hot Water Heater installed in a defective and/or unreasonably dangerous condition;

(g) Failing to use reasonable care to investigate and correct the cause of water accumulating in the Hot Water Heater's condensate lines;

(h) Failure to use reasonable care to make the Hot Water Heater safe and/or incorporate safeguards to ensure the Hot Water Heater and related flue venting, condensate lines, and associated machinery were safe, not defective and/or unreasonably dangerous, including but not limited to, the accumulation of water in the condensate lines, the blockage of the flu, the production of dangerous and/or lethal levels of carbon monoxide and/or the ability of the flu pipe to become disconnected while operating;

(i) Failing to provide adequate warnings regarding known or reasonably foreseeable misuses of the Hot Water Heater or instructions regarding the safe use of the Hot Water Heater;

(j) Failing to properly install and maintain the Hot Water Heater in a manner so as not to render it defective and/or unreasonably dangerous; and

(k) Failing to install and/or maintain the Hot Water Heater in the manner consistent with the applicable codes, regulations, industry standards, and manufacturer's specifications.

194. Defendant Eberly, including but not limited to their agents, servants and/or employees' negligence, negligent conduct and negligent breach of their duties proximately caused the injuries to Plaintiffs, without any negligence on the part of any Plaintiff contributing thereto.

195. As a direct and proximate result of the negligence of Defendant Eberly, including but not

40

AXIS000341

limited to their agents, servants and/or employees, Plaintiffs suffered personal injuries and will continue to suffer brain damage, brain injury, memory deficits, mental anguish, emotional pain and suffering, depression, cognitive and emotional deficits, sleep problems, fatigue, severe headaches, mood fluctuations, physical anxiety symptoms, decreased interest in usual activities, and social withdrawal, medical bills, lost wages, future loss of earnings, and other injuries, without any negligence on the part of any Plaintiff contributing thereto.

WHEREFORE, Plaintiffs demand that this Court enter judgment in favor of Plaintiffs and against Defendant Eberly, finding Defendant Eberly liable to Plaintiffs and awarding Plaintiffs compensatory damages in an amount in excess of $75,000.00, together with attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

Respectfully submitted,

_____

William H. Murphy, III – CPF AIS# 0404060002
Nicholas A. Szokoly – CPF AIS# 0312170297
Andrew K. O'Connell – CPF AIS #0106200194
Murphy, Falcon & Murphy
One South Street, 30th Floor
Baltimore, Maryland 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
nick.szokoly@murphyfalcon.com
billy.murphy@murphyfalcon.com
andrew.oconnell@murphyfalcon.com

_____

Alan J. Mensh – CPF AIS# 9212160224
Ashcraft & Gerel, LLP
120 E. Baltimore Street, Suite 1802
Baltimore, Maryland 21202
Telephone: (410) 385-3280
Facsimile: (410) 547-1261
AMensh@ashcraftlaw.com

41

*Attorneys for Plaintiffs*

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury in this matter.

_____
Andrew K. O'Connell – ~~CPF~~AIS #~~0106200~~194

Dated ~~March 15, 2020~~July            2021

42

AXIS000343

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**, on this _____ day of July 2021, that a copy of the foregoing Second Amended Complaint and Demand for Jury Trial along with a redlined copy was served via email and first-class mail, postage prepaid, upon:

Jennifer A. King, Esq.
DeCaro, Doran, Siciliano, Gallagher &
 DeBlasis, LLP
17251 Melford Boulevard, Suite 200
Bowie, Maryland 20715
jking@decarodoran.com
*Attorneys for Atlas West End Silver Hill, LLC
and Atlas West End Silver Hill Manager, LLC*

David J. Quigg, Esq.
Jessica P. Butkera, Esq.
DeHay & Elliston, LLP
36 S. Charles Street, Suite 1400
Baltimore, Maryland 21201
dquigg@dehay.com
jbutkera@dehay.com
*Attorneys for A.O. Smith Corporation*

Brett A. Buckwalter, Esq.
M. Andrea Olsen-Leyden, Esq.
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
babuckwalter@nilesbarton.com
*Attorneys for Defendants Gates Hudson
Associates, Danielle Samuels, and Andrew
Ferrell*

Jason Waters, Esq.
Regional Managing Partner
Sophia U. Jafrul
Wilson Elser Moskowitz Edelman & Dicker LLP
8444 Westpark Drive - Suite 510
McLean, VA 22102-5102
jason.waters@wilsonelser.com
sophia.jafrul@wilsonelser.com
*Attorneys for Capital Boiler Works, Inc.*

Andrew K. O'Connell – AIS #0106200194

43

AXIS000344